ALBERT PARKER v. J. W. F. HUGHES.

No. 12,632.    (67 Pac. 637.)

SYLLABUS BY THE COURT.

1. ELECTIONS—*Australian Ballot—Defective Marking*. When one's name appears on a ballot more than once as a candidate for the same office upon two or more tickets, as might have been the case under chapter 129, Laws of 1897, and such name is marked with a cross-mark in the squares opposite two or more times, such ballot is not thereby made void, but must be counted, the excess of marks being mere surplusage, and not distinguishing marks.

2. ——— *Distinguishing Marks Invalidate Ballots*. No right to have a ballot counted in a candidate's favor can spring from a criminal act. Hence, where a voter has marked a ballot for the purpose of distinguishing the same, contrary to the provisions of the statute making such marking a criminal act, such ballot cannot be counted, although the statute does not, in terms, forbid it. This is true even though the statute elsewhere specifically enumerates classes of ballots which shall not be counted, without including those with distinguishing marks in the list.

Original proceeding in *quo warranto*. Opinion filed January 11, 1902. *In banc*. Judgment for plaintiff.

*G. C. Clemens, David Overmyer,* and *Ferry & Doran,* for plaintiff.

*Garver & Larimer, Redden, McKeever & Hayden,* and *F. P. Lindsay,* for defendant.

The opinion of the court was delivered by

Cunningham, J.: At the spring election of 1901, in the city of Topeka, plaintiff and defendant were opposing candidates for the office of mayor. The plaintiff had received the nomination from the democratic party and had also been nominated at a meeting of citizens, so that his name appeared twice upon the official ballot. The defendant was the regular nominee of the republican party and had been declared elected by the proper board of canvassers. (*Hughes v. Parker,* 63 Kan. 297, 65 Pac. 265.) This is an original proceeding in *quo warranto* to determine whether plaintiff or defendant was, in fact, elected to the office of mayor at said election. Both parties allege that they received a majority of the votes cast and are entitled to hold the office.

The court appointed James E. Larimer, Esq., commissioner to hear evidence, count the ballots and ascertain the number and character of those disputed. This he has done in a most painstaking and careful manner, and from his report we find that, of the votes cast at said election concerning which no objections were made by either party, Mr. Hughes received 6285, Mr. Parker 6125; that, in addition to this number, there were 274 ballots to which objections for various causes were made by both parties, 217 of these objections being made on behalf of Mr. Hughes and 57 on behalf of Mr. Parker.

From the second precinct of the first ward there

| Party | Instructions | For Mayor |
| --- | --- | --- |
| INDEPENDENT | Electors will make a cross-mark, thus, X, in the square at the right of the name of the candidate for whom they wish to vote. | For Mayor, ☐ |
| CITIZENS' TICKET | Electors will make a cross-mark, thus, X, in the square at the right of the name of the candidate for whom they wish to vote. | For Mayor, ALBERT PARKER. ☒ |
| DEMOCRATIC PARTY | Electors will make a cross-mark, thus, X, in the square at the right of the name of the candidate for whom they wish to vote. | For Mayor, ALBERT PARKER. ☒ |
| REPUBLICAN PARTY | Electors will make a cross-mark, thus, X, in the square at the right of the name of the candidate for whom they wish to vote. | For Mayor, J. W. F. HUGHES. ☐ |

came a package of thirty-six ballots, which package was marked "This package contains defective or objected-to ballots not voted." From the evidence taken, it reasonably appears that twenty-nine of these ballots were put into the ballot-box, and the probabilities are that this package was made up of seven ballots which, for some cause or other, had been returned by the voters to the judges before they were voted, and the other twenty-nine were ballots which came out of the ballot-box, but which had been put aside during the count of the ballots by the judges of election, because their counting had been objected to, and then finally had been gathered together and placed in the package marked as above.

The 274 ballots were imperfect for a great variety of reasons, the greater part of which were based upon the claim made by the defendant that "double-marked" ballots, that is, those on which the name of Mr. Parker was marked in both the democratic and citizens' column, should not be counted. This class of votes, so far as they relate to the office of mayor, will be illustrated by a copy of the ticket, printed on this page. The defendant claims that these should not be counted because such double markings constitute dis-

Parker v. Hughes.

tinguishing marks, within the meaning of the statute; and, further, because they are vicious, under the provisions of the statute which provides that, "if a voter marks more names than there are persons to be elected to an office, his vote shall not be counted for such office." The court, however, is of the opinion that neither of these claims is well founded; that in this case the voters did not mark more names than there were persons to be elected to an office; they only marked the same name more times than was necessary.

The majority of the court, while not agreeing upon the reasons therefor, arrive at the same conclusion, that such ballots are not invalid because of being double-marked. The chief justice and Mr. Justice Pollock arrive at this conclusion from the following reasoning: Section 25 of the Australian-ballot law, chapter 129, Laws of 1897, specifically points out certain ballots that shall not be counted if found marked in the manner therein forbidden. This list prohibits the use of ink or pencil of any other color than black, and requires, by reference to section 22, that the mark used to distinguish the voter's choice shall be a cross, and they think that this list of acts, so enumerated, is exclusive of all others; that the express mention of them for this purpose implies that others are excluded; that, had the legislature intended that ballots should be excluded for other reasons than those mentioned and the voter thus disfranchised, it would have said so and not left it to inference; that, there being no statute requiring the rejection of ballots because of distinguishing marks, no ballot may be rejected because of such marks. True, section 27 of this law makes the act of placing such marks upon the ballot a penal one, and while the general law of the state is that an act done in violation of a criminal statute is a

nullity, this rule does not here obtain, for the reason that it is overborne by the stronger one, that the legislature having designated certain ballots that must be rejected, those are the only ones that can be rejected. This view will be found well supported by the following authorities where the provisions of the Australian-ballot system have been construed and applied : Wigmore, Australian-ballot System (2d ed.) 193, *et seq.*; *People, ex rel. Fenny, v. Bd. of Canvassers,* 156 N. Y. 36, 50 N. E. 425 ; *Attorney General v. Glaser,* 102 Mich. 406, 61 N. W. 648 ; *Sawin v. Pease,* 6 Wyo. 92, 42 Pac. 750 ; *State, ex rel. Orr, v. Fawcett,* 17 Wash. 188, 49 Pac. 349 ; *Nicholls v. Barrick,* 27 Colo. 432, 62 Pac. 202. Clearly, under this reasoning, the double-marked ballots must be counted.

Mr. Justice Smith is of the opinion that no right to have the vote counted in a candidate's favor ought to spring from a criminal act on the part of the voter, so that, if it appears that a mark has been placed upon a given ballot for the purpose of distinguishing it, such ballot cannot be counted. The placing of names or initials upon the ballot and the making of cross-marks in the squares opposite the blank spaces with no names written therein are cited as instances of such distinguishing marks, these making it apparent that the voter intended to violate the law. But the double marking of the same name, where that name has been printed twice, and thereby an implied invitation extended to the voters so to mark, is not of itself such a distinguishing mark. While section 27 of chapter 129, Laws of 1897, makes it a penal act for a voter to place on his ballot "any character or mark for the purpose of identifying said ballot," he feels sure that no court would sustain a conviction under this provision of any one of the 176 electors who voted

these double-marked ballots, upon their admission of the fact; hence, because these voters would not be liable to the punishment under this penal provision for voting these double-marked ballots, he thinks that they should be counted; that, as regards other irregular and questionable markings on the ballots, the judges of election or of courts called upon to count the same must in each case determine from an inspection of the ballot what the intention of the voter was—whether such mark was intended as a distinguishing one or not.

Mr. Justice Ellis is of the opinion that not only must those ballots which are marked in the manner forbidden by section 25 be excluded, but also ballots marked in contravention of the terms of the penal section 27—that is, a ballot bearing a distinguishing mark purposely made should be rejected if the mark is of such nature, or is so placed on the ballot, that the judges or courts might find, in the absence of testimony, or upon testimony if offered, that there were reasonable grounds for believing that such mark was made by the voter with the intent that his ballot should be distinguished from others in the box; that, in determining what ballots should be counted, the court should look at the questioned one and from such inspection, aided by the notorious facts and circumstances of the election at which it was cast, determine whether the questioned mark was intended by the voter as a distinguishing mark or not, and if, upon such inspection and consideration, aided by evidence *aliunde* if offered, the court should conclude that the mark was made for the purpose of distinguishing the ballot, or might be reasonably thought so to be intended, the ballot should not be counted. In this case, applying this rule, the conclusion is reached that the double-marked ballots

should all be counted for Mr. Parker. The justice whose views have just been outlined lays down four rules to govern in the counting of questioned ballots. He would exclude: (1) Those where ink or pencil other than black has been used to mark it; (2) those which are not marked as required by other sections than section 25; (3) those where for any reason it is impossible to determine the voter's choice for an office to be filled, excluding the vote only as to such office; and (4) those where the voter has marked more names than there are persons to be elected to an office, excluding the vote only as to such office.

Whether we take the view that the counting of ballots with distinguishing marks is not prohibited, but rather required by the statute, or that these double-marked ballots are not vicious as ballots marked to be distinguished, it follows that they must all be counted for Mr. Parker. We quote with approval the law as laid down in the syllabus in *People, ex. rel. Fenny, v. Bd. of Canvassers*, 156 N. Y. 36, 50 N. E. 425:

"The presence of cross-marks before the name of the same candidate for the same office in two different columns is to be regarded as surplusage merely, and does not render the ballot invalid as a ballot marked for identification." (See, also, *Attorney General v. Glaser*, 102 Mich. 406, 61 N. W. 648; *Sawin v. Pease*, 6 Wyo. 92, 42 Pac. 750.)

It is not contended by the defendant that these double-marked ballots, of which there are some 176, are in terms excluded from the count by the statute, but only that they must be excluded because such double marking constitutes a distinguishing mark, by which it may be inferred that the voter sought to distinguish his ballot for the purpose of being able to assure a purchaser of votes that he had "delivered the goods." It must be admitted that these marks

do not necessarily indicate a corrupt purpose.   It is as reasonable, or more reasonable, to say that the voter so marked his ballot out of a superabundance of caution, or because he found Mr. Parker's name printed twice and supposed therefore that he was to put down two crosses, as to say that his act must be explained upon the hypothesis of a corrupt motive. This is made doubly forceful when we remember the large number of ballots so marked, coming from all parts of the city.   It is the duty of the court to ascertain the intent of the voter, and, if it may fairly and reasonably deduce a motive consonant with honesty, rather than dishonesty, from his ballot, to count the same for the candidate of his choice, rather than to disfranchise him.   A distinguishing mark, to warrant the rejection of the ballot, must be found to have been made for the purpose of identification.

These double-marked ballots must all be counted for Mr. Parker.   This leaves fifty-seven ballots claimed by Mr. Hughes and objected to by Mr. Parker, and about forty-one ballots claimed by Mr. Parker and objected to by Mr. Hughes, to be disposed of.   No general rule other than that already laid down can be invoked to aid us in counting these.   Quite a number are marked with ink or with pencil other than black, and these are all rejected.   Some are marked with a single stroke, thus ◺ or thus ◿ or thus ▯ or thus ▭ , instead of a cross; these also must be rejected.   Some are marked with a cross after a name and also with a cross in the square after the blank space on the right of the ballot, without any name being written there ; these are rejected as being distinguishing marks.   Some are found with lines drawn diagonally across the face of the ticket not voted ; others with perpendicular lines through these

names; others where names of candidates have been wholly or partially obliterated by pencil marks drawn over them; others with names or initials written thereon—these are rejected as being made invalid by distinguishing marks.

As to the balance of these disputed ballots, they have all been carefully gone over and have been rejected or counted, in each case as the court by an examination of the markings thereon came to the conclusion that there were reasonable grounds for believing that such mark was, or was not, made by the voter with the intent that his ballot should be thereby distinguished.

In the matter of the thirty-six ballots which came from the second precinct of the first ward, the plaintiff claims that the extra seven ballots should be excluded, under the rule laid down by McCrary in his work on Elections, section 495 (4th ed.)—that is, by deducting the same from the vote of both parties in proportion to the vote for each in the precinct. The defendant claims that, inasmuch as it cannot now be determined which of these ballots were voted, the entire thirty-six ought to be excluded from the count; otherwise votes might be counted which were never voted. To sustain this claim, the rule in Paine on Elections, section 513, is cited. We are of the opinion that the rule invoked by the plaintiff is the proper one, so we consider all of these ballots. But upon looking into them we find there are but twenty-one which are entitled to be counted, the balance being faulty for various reasons. These twenty-one ballots we count for the candidates for whom they were cast in each case.

From the entire list of disputed ballots, we find that Mr. Parker is entitled to have counted for him 189.

Parker v. Hughes.

These, added to his undisputed ones, give him a total vote of 6314.   Mr. Hughes is entitled to have counted for him, out of the disputed ballots, twelve, which gives him a total vote of 6297, giving Mr. Parker a majority of seventeen votes.

It follows, therefore, that the judgment of the court must be for the plaintiff.

DOSTER, C. J., SMITH, POLLOCK, JJ., concurring.

JOHNSTON, GREENE, JJ., dissenting.

CUNNINGHAM, J. (dissenting) : The foregoing opinion indicates the judgment of the court, not that of the writer thereof.   It will be noticed that by different ratiocination the majority arrive at the same conclusion.   They proceed along different and divergent pathways, but find themselves together at the end of the journey.   This indicates that some of them are wrong.   I think that some of them are mostly wrong in their reasoning, some of them are altogether wrong in their reasoning, and all of them entirely wrong in their judgment.   I dissent therefrom, and am authorized to say that Mr. Justice Johnston and Mr. Justice Greene join with me in this dissent.   We, however, concur with Mr. Justice Smith and Mr. Justice Ellis in holding that a ballot obnoxious to the provision of section 27, which makes it criminal to mark a ballot "so that it can be distinguished," cannot be counted.   While that section does not expressly say that ballots so marked shall not be counted, yet that is the necessary implication.   As Mr. Justice Smith well and tersely says : "No right to have the vote counted in a candidate's favor ought to spring from a criminal act on the part of the voter."   The authorities, so far as we have been able to find them, all concur in this view.   Any other view would seem

15—64 KAN.

strange when we remember how inadequate the remedy of a criminal prosecution would be. Both purchaser and seller of votes get away with their ill-gotten goods, the one with the office and. the other with the price, and no harm can come to them except through a criminal proceeding, and then only upon evidence of their guilt excluding a reasonable doubt. ( *Whittam v. Zahorik*, 91 Iowa, 23, 59 N. W. 57, 51 Am. St. Rep. 316 ; *Van Winkle v. Crabtree*, 34 Ore. 462, 55 Pac. 831, 56 id. 74 ; Black, Interp. of L. 64.) This theory has the merit of being easy to understand and apply.

As a basis of this argument, it will be assumed that ballots obnoxious to the provisions of section 27 ought not to be counted. At this point, however, Justices Smith and Ellis leave us. They prefer to adopt the uncertain rule of. determining from the face of the ballot, aided by what the judges may happen to know outside, or by evidence *aliunde*, what are distinguishing marks; rather than by the safe and certain rule prescribed by the law. It is entirely competent for the legislature to throw around the exercise of the elective franchise such safeguards as, in its discretion and sound judgment, it shall deem best to insure a pure and secret ballot. It is the ˙ acknowledged primary object of the Australian-ballot law to accomplish this end. Its accomplishment is more important than that all persons of the requisite age should be counted in the poll, the object being, as regards votes, quality first and quantity afterward. So the law may well say to the voter that if he wishes his vote to be counted he must record his choice of candidates in this prescribed manner ; that his intention to vote must be ascertained in a given way. There is no hardship in this. If the citizen would vote, let him

prepare himself to do so in the manner that the law prescribes. In this there is safety for his vote and our institutions as well. If the board of election judges, or the larger board of supreme court judges, who have counted the ballots in this case, assume to ascertain the intention of the voter from the face of the ballot, when that intention has not been expressed in the way pointed out by the statute, they may, perchance, deduce the wrong intention—may disfranchise the voter; but, however this may be, this court, following many others, has already decided that the provisions of the Australian-ballot law are mandatory, and that ballots not marked in accordance with those provisions are not entitled to be counted. (*Taylor v. Bleakley*, 55 Kan. 1, 39 Pac. 1045, 28 L. R. A. 683, 49 Am. St. Rep. 233.) Hence, there only remains for us to inquire what those provisions are.

As to the marks mentioned in section 25, we are all at one. The law says expressly that the ballot shall not be counted if marked as therein forbidden. As to the so-called distinguishing marks mentioned in section 27, the majority hold them to be as fatal, if they are distinguishing marks. But, to be distinguishing marks that shall be obnoxious to the law, Justices Smith and Ellis say that they must not only be marks that distinguish, but that the judges by looking at them must in some unexplained and occult manner be able to deduce therefrom the intent of the voter thus to distinguish the ballots. This interpretation is faulty for two reasons. First, it is not consonant with the language of the statute. The inhibition by the statute is against the counting of the ballot when "any person shall . . . mark or fold his ballot *so that it can be distinguished*." If the marking or folding is of such character that from it the

ballot could be distinguished, then it may not be counted. The ban of the law is upon the ballot if it be marked or folded so that it can be distinguished. Second, with this interpretation the law is entirely without force. and cannot be administered with certainty. One judge may look at a ballot on which are distinguishing marks and say that he does not think that the voter intended by this mark to distinguish the ballot, and another judge, looking at the same ballot, may come to a contrary conclusion. This case furnishes many examples of such variance.

The voter's intention in this matter must be gathered from what he does. If the ballot be marked "so that it can be distinguished," then the mark is a distinguishing mark. If the voter does not know how to mark his ballot, sworn assistants are provided. If he spoil his ballot, another can be obtained. How small a percentage of voters there are who do not know how to vote under this system is shown by the fact that in the election now being considered only about two per cent. of the votes cast are involved in this controversy. This two per cent. of the voters would better be disfranchised than that the ballot law be despoiled of its safeguards. Our brethren have brought the principle for which they stand— that of arriving at the intention of the voter—from the old methods. Before the enactment of the reformed methods of voting, commonly called the Australian-ballot laws, the intention of the voter thus determined was the solvent which was applied to all difficult questions, and unutterable confusion was the result. Under the new law the intention may be found only in the voter's act.

In our opinion, these double-marked ballots are so marked that they can be distinguished. That

there are 176 of them rather than one does not change their character. They should not be counted, because the law forbids the counting of ballots with distinguishing marks. That in this case there are so many does not matter. In some other election there might not be so many. It is a rule which is being established and not a particular application. We think the authorities, so far as they go, hold with this contention. The case of *Attorney General v. Glaser*, 102 Mich. 406, 61 N. W. 648, cited above, was one in which the identical question at issue here was presented. The court in the original opinion (102 Mich. 396, 402) held in the following language:

"A large number of defective ballots had a cross under the party name of the republican and also of the citizens' ticket. The tickets were, it is true, identical; but a single mark constituted a vote, and the second mark was wholly unnecessary and inappropriate to register the voter's intent—as much so as would have been any mark placed under the democratic ticket. Such mark might have been an agreed means for identification of the ballot, and must be held to have been a distinguishing mark. There were also a number of tickets in which the names of the candidates as they appeared on both tickets, both being identical, were marked. These are subject to the same considerations."

But afterward, on a rehearing of the case, it having been called to the attention of the court that the attorney-general had on three different elections expressed a widely disseminated opinion construing the law otherwise, which opinion had quite generally been acted upon, the court, without in the least changing its former judgment, expressed itself, at page 409, as follows: "We think, in view of this practical construction, it should be held that the class of ballots above referred to are not illegal." So that on princi-

ple the Michigan supreme court stands committed to the proposition that such ballots should not be counted.

The New York case (*People, ex rel. Fenny, v. Bd. of Canvassers*, supra) was decided by a divided court. Even the opinion of the majority is based upon an analogy existing between the question in hand and the express provision contained in another part of the statute. So that, at its best, this case is of light weight as an authority here. The minority, however, two to three, express themselves in the following language, speaking of double-marked ballots :

"It was an attempt to vote twice for the same candidate, and whatever may have been the intention of the voter, the second voting mark is prohibited by the statute, since it would be a convenient means of identification, and hence these ballots cannot be counted."

As bearing upon the particular question, and as indicating the strictness with which the various courts are applying the provisions of the Australian-ballot law, and as suggestive of the wide departure this court is making by the judgment of the majority in this case from such general trend, the following quotation is made from a recent California case, *Farnham v. Boland*, 134 Cal. 151, 66 Pac. 200, at page 201 :

"Under objection No. 1, we find a class of ballots counted by the trial court, where a cross is placed in a square, there being no candidate's name opposite the square. Such a cross is not in a legal place. The voter had no right, under the law, to place it there, and it is a distinguishing mark, which demands the rejection of that class of ballots. Under objection No. 2, a cross is found upon a class of ballots directly upon the line dividing the two squares. There is also a cross in each of the squares after the respective candidate's name. Thus there is found a cross not authorized by the law, which may well serve as a

means of identifying the ballot, and ballots so marked should be rejected.   Under objection No. 3, the court finds a class of ballots where two crosses are made after the candidate's name, one within the square and one without the square.   There is no simpler way of evading the provision of the law than for a voter to mark his ballot in this manner.   These crosses so placed are clearly identifying marks, and all ballots so appearing should be rejected.   Under objection No. 4, the court finds a class of ballots ·with two crosses in the square.   Upon some of these ballots the crosses are entirely separate, and upon others they are interlaced and joined in many different ways. The law says the voter shall stamp a cross after the name of the candidate ; not two crosses, or three crosses, but a 'cross.'   Two crosses in the square is no less a mark of identification than two crosses one without and one within the square.   An allowance of this practice would furnish a· simple expedient by which the law could be violated.   Two crosses in the square is not a legal mark upon the ballot.   The law only contemplates one cross, and therefore ballots so marked should be rejected.''

There can be no question but that the courts generally are strictly applying the provisions of the reformed election laws, and holding such provisions mandatory.   What reason else for these laws ?   If the old rules of groping and agonizing for the intention of the voter, with little regard for the actual character of his ballot, were sufficient, why should the legislature seek to introduce others ?

As pointed out in *Taylor v. Bleakley*, supra, the legislature of this state has authoritatively construed its own law by adopting without dissent the report of a committee containing the following :

''The great innovation upon the prior law made by the Australian law is that the intention of the voter shall be ascertained by an application to the ballot of the directions contained in the statute, and the pro-

visions of our statute directing the manner in which
the voter shall express his choice are mandatory. An-
other object of the law is to prevent the putting upon
the ballot, by the voter or any other person, any mark
save and except the cross in the proper space which
will designate that ballot from any other ballot cast.
Should the door be open to permit the counting of
ballots containing any other than the marks permit-
ted by the statute, it would enable persons who had
bargained for votes to agree upon a distinguishing
mark, whereby it could be determined, by a mere in-
spection of the ballot, whether or not the voter had
carried out his part of the contract, thereby thwart-
ing one of the main objects of the law.''

The declaration on the part of the legislature of a
rule of construction of its own enactment ought to be
felt as of some binding force upon this court, even if
its own approval of that rule, as found in *Taylor v.
Bleakley*, is not.

The difficulties with which the majority have
struggled in the application of their ''intention of the
voter'' theory amply illustrate the untenable charac-
ter of that theory. By way of illustration, we cite a
few noticed as the count proceeded in this case. A
cross-mark after the name of either Hughes or Parker,
and also one in the square on the independent ticket
without a name, were thought to indicate a purpose
to distinguish, while a cross after the name of Parker
wherever it appeared on the ballot did not. A cross
partially obliterated by scratching with a black lead
pencil is held not to be a distinguishing mark, while
one still further scratched, so that the cross is en-
tirely obliterated, is found to indicate to the discern-
ing mind a bad purpose. If the scratching still
further proceeds, aided apparently by the sharp edge
of a knife, so that a hole is left in the paper where
the black spot had been, we are able to declare—by

Parker v. Hughes.

seeing through it—that the ballot was not thereby in-
tended to be distinguished.   A cross-mark to the left
of a name partially erased distinguishes a ballot, but
a like mark in one of the squares to the right of
Parker's name does not.   A single stroke in the
square after Hughes's name makes a bad ballot, but
a like stroke in one of the squares after Parker's name
does not, providing a good cross is found in the other
square.   The "intention of the voter" is found to be
bad if he makes a cross outside of the printed square,
the statute not specifically requiring it to be made in
the square.   A name or initials written on the ballot
causes it to be rejected, unless by a comparison with
other initials on the ballot, supposed to be those of
an election judge, and by looking at the words "sworn
ballot" also written thereon, it shall be decided that
probably the name was written there by the election
judge.   It is decided that the intention of the voter
who deposited this ballot   For Mayor, ALBERT PARKER ⊠   was
all right; while the voter who deposited this one
For Mayor, J. W. F. HUGHES. ⊠   intended it to be distinguished.
The size of the mark evidently had somewhat to do
with the application of the theory, because this ballot
For Mayor, J. W. F. HUGHES ⊠   was found to be without fault.

A correct intention on the part of the voter was oc-
casionally so clearly discerned from the face of the
ballot that a cross-mark specifically required by the
statute was not found to be necessary to express it,
as is evidenced by this ballot   For Mayor, ALBERT PARKER. ⟋
and this   For Mayor, J. W. F. HUGHES ⟨Ɋ⟩   which were counted.

However, it is not permitted that this departure shall go too far, for this ballot $\overline{\begin{array}{c}\textit{For Mayor,}\\ \text{J. W. F. HUGHES.}\end{array}}$ was rejected. Again, perhaps the size of the mark had somewhat to do with the ability to determi.ie the intention.

Had the court in this case, after having admitted to the count all of the ballots doubled-marked for Mr. Parker with two good crosses, then applied what seems to us to be the rational rule in the counting of the balance, the result would have been different. We think, however, that these double-marked ballots were not only distinguished by such marking, so as to require their rejection, but that they also should have been rejected because they are expressly excluded from the count by the language of the statute. "If the voter marks more names than there are persons to be elected to an office" his ballot may not be counted. This language does not mean the same as if it read: "If the voter marks the names of more persons than are to be elected to an office." It reads "more names." Print the name of the same candidate as many times as you may choose on the ticket—that is advantage enough—but do not mark it but once. In not a few instances in this count did Mr. Parker gain a vote because a good cross-mark in one square helped out a poor one in the other.

On the question of the thirty-six ballots returned from the second precinct of the first ward under cover marked, "This package contains defective or objected-to ballots not voted," we are of the opinion that none of the ballots should have been counted, it not appearing which of them had been voted. We do not now know but that, at least, some portion of the ascertained majority for Mr. Parker is made up

of ballots never put into the ballot-box.   It may be true that if the entire thirty-six ballots be thrown out, twenty-nine legal votes will be ignored, but it is also true that if all are considered a candidate may be elected to office by votes never put into the ballot-box and which represent no voter.   In the case of *The State, ex rel., v. Stevens*, 23 Kan. 456, where substantially the same question was presented, this court, at page 458, used this language : "While legal and honest votes were cast, yet no court is under obligation to attempt to sift the grain of truth from the mass of falsehood."

Finally, we deem it our duty to call attention to the fact that but one single legal proposition is settled in this case.   All of the justices, except the chief justice and Mr. Justice Pollock, hold that ballots which are obnoxious to the penalties denounced upon those who mark their ballots as indicated in section 27 should not be counted ; and, further, that the apparent abandoning of the rule for determining the validity of a ballot as laid down by this court in *Taylor v. Bleakley*, supra, is more apparent than real.   The two justices last named repudiate the proposition that a ballot can be rejected at all on account of a distinguishing mark, while Justices Smith and Ellis only stand for the rule that only such marks are distinguishing ones, requiring the rejection of the ballot, which the judge who is counting it shall conclude from all of the circumstances were intended to distinguish the ballot.

Again, we say that in our opinion the statute requires the rejection of all ballots on which the voter has purposely made marks "so that it can be distinguished," and, as the application of this rule would

result in a judgment for the defendant in this case, we dissent from the judgment rendered in favor of the plaintiff.

ELLIS, J. (concurring) : In the hope that I may be able to state somewhat more clearly than is done in the majority opinion the principles which it seems to me should control, and the rules of construction which I feel bound to follow in this case, I shall undertake to recite my views in relation thereto.

In the dissenting opinion it is said : "Our brethren have brought the principle for which they stand— that of arriving at the intention of the voter—from the old methods." So far as the statement relates to the writer it is partially true, and if the further charge had been made that we were inclined to hold that we could not abrogate that provision of our present statute which negatively, but by clear implication, requires the intention of the voter to be considered, the position of the two members of the court to which the above quotation applies would have been fully stated. The rule in existence before the adoption of the Australian ballot undoubtedly was that the intention of the voter, when ascertainable by an inspection of the ballot by the election board, or in case of an ambiguous ballot, aided by evidence *aliunde* in a contest before the courts, should govern. So general was the acceptance of that precept that the few exceptions only served to emphasize its salutary nature and the dominion accorded to it in the states of the union.

In *The People v. Cicott*, 16 Mich. 282, 97 Am. Dec. 141, the learned judge and text-writer, Mr. Justice Cooley, said :

"All rules of law which are applied to the expression, in constitutional form, of the popular will should

aim to give effect to the intention of the electors, and any arbitrary rule which is to have any other effect, without corresponding benefit, is a wrong, both to the parties who chance to be affected by it, and to the public at large. The first are deprived of their offices, and the second of their choice of public servants."

The doctrine received the cordial support of Judge McCrary, who, in his work on Elections ( ch. 14, § 480 ) strongly indorses the opinion of Justice Cooley, from which the foregoing excerpt is taken, and Mr. Paine, in his work on Elections, unqualifiedly approves this interpretation of the law. ( Paine, Elect. § 538. )

In the case of *Clark v. Comm'rs of Montgomery Co.*, 33 Kan. 202, 6 Pac. 311, 52 Am. Rep. 526, this court held :

"The intention of an elector is to be ascertained from the language of his ballot, read in the light of the circumstances of a public nature surrounding the election at which it is cast; and though his will is not expressed with precision, yet if it is fairly apparent, and can be determined beyond a reasonable doubt, it should be made effectual."

The important question now presented is whether the rule that where the intention of an elector could be thus ascertained it should be made effectual has been abrogated in this state. It certainly has not been by statute, for the last expression of the legislative will, subject to certain exceptions, continues this principle in force. Section 25 of chapter 129, Laws of 1897, so far as it relates to the subject under discussion, reads as follows :

"If the voter marks more names than there are persons to be elected to an office, or fails to mark the ballot as required by other sections of this act, or uses ink, or a pencil of any other color than black to mark

his ballot, or if, from any reason, it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office."

Note the language, "if, from any reason, it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office." *Ergo*, if it be possible "to determine the voter's choice for an office to be filled," his ballot should be counted for such office, unless some other provision of the statute requires its rejection. It is submitted that its vitality has not been impaired by any decision of this court, although my brethren who dissent cite the case of *Taylor v. Bleakley*, 55 Kan. 1, 39 Pac. 1045, 28 L. R. A. 683, 49 Am. St. Rep. 233, as denying the continuance of the rule. The only proposition authoritatively determined in that case was that the cross-marks should be placed within the squares provided for that purpose, in accordance with a provision of the statute which the majority in this case have respected and treated as mandatory. It could not be abolished by the dictum of a legislative committee whose report related not to a bill recommended for passage. That report was made in a contest case under an existing law and it gave an opinion of such committee as to the construction which it thought should be given the provisions of such law.

It seems to be claimed, however, that the will of the voter is no longer to be considered in those states which have adopted what is known as the Australian-ballot law, although such laws, as enacted in the different states, are widely dissimilar in their provisions, and are still subjected to frequent amendments. With what talismanic power is the mere name "Australian-ballot law" invested that it may be held to work such a transformation?

It may be profitable to investigate the question whether the salient guides so long and generally followed have been set aside by the adoption of those statutes.  The only recognized author upon the Australian-ballot system, in the last edition of his work, said :

"Wherever our statutes do not expressly declare that particular informalities avoid the ballot, it would seem best to consider their requirements as directory only.  The whole purpose of the ballot as an institution is to obtain a correct expression of intention ; and if, in a given case, the intention is clear, it is an entire misconception of the purpose of the requirements to treat them as essentials, that is, as objects in themselves, and not merely as means."   (Wig. Aust. Bal. Syst. [2d ed.] 193.)

The same author, continuing, said :

"In the British, Belgian, Canadian and some of the Australian statutes an identifying mark is specially declared to avoid the ballot.   This rule has been interpreted in two ways.   By some courts it is held to be sufficient if the mark is one by which the voter *might* be identified. . . .   This, of course, results in throwing out a very large proportion of ballots in which informal marks occur, *though it is expressly said, as a part of the rule, that ordinary deviations due to awkwardness or carelessness are not to be regarded.* . . . The rule has been stated as follows ( more liberally than in the cases *supra*) : 'Whenever the court is convinced that the irregularity was the result of awkwardness, or a stiff, heavy or trembling hand, of carelessness, or an attempt to correct a supposed defect or to make a line more clear or more straight— whenever, in short, it appears that the addition to the required cross or the form of the cross or its embellishments are owing to an unskilled hand rather than to a desire to identify one's self—whenever the identification of the voter is rendered impossible by the impossibility of reproducing the same pencil-marks, the vote is good."

The same author, citing with approval the opinion of Mr. Justice Alleyn, in *Dionne v. Gagnon*, 9 Queb. L. R. 20, said : "According to a second and sounder view, the ballot must itself furnish clear evidence of an improper agreement, such as the voter's initials, or a mark known to be his," in order that it may be rejected. (Page 194.)

A recent decision of the supreme court of Connecticut, one of the first states in the Union to adopt the Australian ballot, overruled the early case of *Talcott v. Philbrick*, 59 Conn. 472, 20 Atl. 436, 10 L. R. A. 150, and held as follows :

"Marks upon the face of ballots which appear or are shown to have been made accidentally and not for the purpose of indicating the voter, and changes for the existence of which a reasonable explanation consistent with honesty and good faith either appears upon the face of the ballot or is shown by proof, do not render the ballots void." (*Coughlin v. McElroy*, 72 Conn. 99, 43 Atl. 854, 77 Am. St. Rep. 301. See, also, cases cited in note.)

In the case of *The State, ex rel. Orr, v. Fawcett*, 17 Wash. 188, 49 Pac. 349, it was held :

"It is also undisputed that the elective franchise, though a constitutional privilege and right, must be exercised under such reasonable legislative restrictions as will prevent intimidation, bribery, and fraud, and secure an honest, untrammeled and genuine expression of public sentiment. It is also true, however, that in the absence of constitutional inhibition, all statutes tending to limit the citizen in the exercise of the right of suffrage should be liberally construed in his favor. If his ballot is rejected, it must come within the letter of the prohibition ; and when the statute specifically declares under what conditions ballots shall be rejected, courts should not enlarge those conditions, or make other or different conditions from those expressed in the statute grounds for re-

jecting the ballots. . . . The important thing is to determine the intention of the voter, and to give it effect.''

In considering a case under the Australian-ballot law, the supreme court of Missouri quoted with approval the following language from a decision of a sister jurisdiction : ''All statutes tending to limit the citizen in his exercise of this right (of suffrage) should be liberally construed in his favor.'' (*Bowers v. Smith,* 111 Mo. 45, 20 S. W. 101, 16 L. R. A. 754, 33 Am. St. Rep. 491.)

The supreme court of California, in *Tebbe v. Smith,* 108 Cal. 101, 41 Pac. 454, 29 L. R. A. 673, 49 Am. St. Rep. 68, cited and applied the language just quoted to the marking of a ballot by a voter under the California statute. In a recent case in California it was held that the writing by a voter, on his ballot, of the party designation of a candidate, after the name, which he has also written in, does not constitute a distinguishing mark which invalidates the ballot. (*Jennings v. Brown,* 114 Cal. 307, 46 Pac. 77, 34 L. R. A. 45.) And it was so held because the court said : ''It is quite manifest in this case that the words were not intended as a distinguishing mark,'' and, for the reason that the law might be construed as permitting it.

In *State, ex rel. Waggoner, v. Russell,* 34 Neb. 116, 121, 51 N. W. 465, 467, 15 L. R. A. 740, 33 Am. St. Rep. 625, it was determined :

''It is not every mark by means of which a ballot might subsequently be identified which is a violation of the statute. The mark prohibited by law is such an one, whether letters, figures, or characters, as shows an intention on the part of the voter to distinguish his particular ballot from others of its class, and not one that is common to and not distinguishable from others of a designated class.''

16—64 KAN.

The court in that case approved of the language hereinbefore quoted from page 193 of the treatise on the Australian-ballot System by Mr. Wigmore.

In *Bechtel v. Albin*, 134 Ind. 193, 33 N. E. 967, a requirement that the voter should "indicate the candidates for whom he desires to vote by *stamping the square* immediately preceding their names," was held to be mandatory. Still, a ticket wherein "the stamp touched slightly the lower side of the square" was held to be "in substantial compliance with the law, and as not containing distinguishing marks and mutilation."

The supreme court of Colorado, in the recent case of *Nicholls v. Barrick*, 27 Colo. 432, 62 Pac. 202, 205, held :

"That a ballot should be admitted if the spirit and intention of the law are not violated, even though not literally in accordance with its provisions ; and that unless the statute declares that a strict compliance with its requirements by the voters is essential to have their ballots counted, the courts will not undertake to disfranchise them, if, in the attempted exercise of their right, there is manifestly an effort to comply in good faith with the statutory requirements."

Authorities might be multiplied, but no useful purpose would be subserved thereby. On the other hand, it is true that the courts of last resort in many, and, perhaps, a majority, of the states having the so-called Australian-ballot law have inclined to give a stricter and less liberal construction of its provisions. In so doing they have disregarded the more liberal rules of construction which obtain in Australia, whence many provisions of these laws are derived. In most cases, however, the rule of construction thus indorsed is authorized by the plain letter of the statute in the particular state adopting it, though it must be confessed

that at least two, and perhaps more, of the states have applied with great vigor the rule excluding ballots on account of distinguishing marks thereon, although the lawmakers of such states failed to enact provisions authorizing such decisions.  Nevertheless, what Jeremy Bentham styled "judge-made law" is now gravely commended to us as a controlling factor in determining the questions here pending.  Inasmuch as our statute does not, in terms, exclude ballots from the count because of distinguishing marks, the question here presented is not so much one of construction as whether we shall read into the statute words not placed there by the legislature.

Returning now to the statute, and considering directly the matter of distinguishing marks thereunder, it may be remarked that in enacting section 25 the legislature assumed, if it did not intend, that some ballots with marks upon them other than those required by the statute should be counted, at least in part.  It is there provided, in substance and effect, that if it is impossible to determine the voter's choice for a given office, his ballot for such office shall be rejected, but that it shall be counted for other offices as to which the voter's will is clear.  Of course, if there were no mark upon the ballot made with reference to the office for which it is not to be counted, it plainly could not be counted for that office, and a legislative expression to that end would be wholly unnecessary.  It is, therefore, certain that the provision was made upon the supposition that certain marks would be made upon the ballot for a given office from which it would not be possible to glean the voter's intention ; still, the ballot is to be counted for other offices named therein, notwithstanding it bears the ineffective marks thus made, except in cases where

the marks are of such nature as to exclude the ballot under other clauses of that section or other sections of the statute. Again, it is provided in the same section that "if the voter marks more names than there are persons to be elected to an office . . . his ballot shall not be counted for such office." This clearly implies that although he may have marked more names than there are persons to be elected to an office, and thus made one or more marks not required by the statute, his ballot may still be counted for other offices. This conclusion is irresistible, because the only provision in the statute for excluding a ballot upon which a voter marks more names than there are persons to be elected to an office is the one providing that it "shall not be counted for such office."

That all ballots having marks upon them which are unnecessary and which might possibly serve to distinguish them from others are not to be excluded from the count, logically follows from the fact that the law expressly provides that ballots marked in a particular manner shall be so excluded. The maxim, *"expressio unius est exclusio alterius,"* is directly applicable and controlling in the construction of this statute, and if there were no other provision from which it could be fairly inferred that the legislature intended that ballots containing certain distinguishing marks should not be included in the enumeration, I would join Mr. Chief Justice Doster and Mr. Justice Pollock in holding that distinguishing marks, other than those designated or referred to in section 25, could not operate to exclude a ballot from the count. I am constrained to believe, however, that section 27 may not be ignored in determining what ballots are rendered ineffective because of distinguishing marks. It is there provided that "any person who shall . . . mark or fold

his ballot so that it can be distinguished, or allow his ballot to be seen by any person with an apparent intention of letting it be known how he is about to vote . . . or who shall place upon or induce any person to place upon his . . . ballot, any character or mark for the purpose of identifying said ballot," shall be guilty of an offense for which a penalty is prescribed in said section. In view of the maxim, "*crimen omnia ex se nata vitiat*," I am unable to see how one who marks or folds his ballot so that it can be distinguished, with an apparent intention of letting it be known how he is about to vote, or who places upon his ballot a character or mark for the purpose of identifying it, in violation of the plain provisions of this statute, can be heard to complain at the refusal of election boards or courts to give effect to his unlawful exercise of the right of suffrage by counting his ballot; and it is quite certain that a candidate for whom the vote was intended can have no standing in a court to urge that he be awarded the fruits of an act tainted with crime, and committed in violation of a penal statute.

Without restating my views as given in the majority opinion of the court, I only desire to avoid a misapprehension of them by specifying that it is not believed that an election board, whose duties are merely ministerial, has any authority to receive evidence as to a voter's intention. In the dissenting opinion, attention is called to the difficulties to be encountered in an application of the "intention of the voter theory." While admitting that one who pursues that course is not exempt from embarrassment, it is submitted that patient and learned thought and research have not yet discovered a method of dealing with the subject which is less obnoxious to objection and criticism. The dif-

ficulties which must be encountered under any system find illustration is this case.

Herein, all ballots not otherwise objectionable, having crosses within the prescribed squares, were counted. Some of these crosses were small, others were large ; some were in the center, others at the sides, and still others in the corners of the squares.  Authorities are agreed that if the cross made within the square sufficiently conforms to the statute the vote must be counted, although the form or location of such cross might possibly serve as a distinguishing mark.  Such being the law, suppose, by prearrangement, the crosses upon a given ballot were all made in the lower left-hand corners of the squares, that fact would serve to distinguish the ballot, and still it would have to be counted by the judges of election, and in case of contest, by the courts, unless by evidence *aliunde* the vicious compact should appear.  It would be easy to point out other methods of marking a ballot so as to distinguish it without destroying its effectiveness, in the absence of evidence.  Can it then be assumed that the legislature, without an expression to that effect, intended that every mark upon a ballot which might serve to distinguish it from others should render such ballot impotent ?  If such a rule had been applied in this case, several ballots for Mr. Hughes would have been excluded which were in fact included in the count.  One ballot was soiled as by a sleeve or dirty hand, probably the latter.  Another had a short, irregular mark upon it, as if carelessly made by the voter while examining the ballot, by pushing or drawing the pencil.  It was near the cross-mark opposite Mr. Hughes's name, and connected with it, though partly without the square.  It clearly served to distinguish the ballot from all others ; still it was counted

by unanimous agreement. Many ballots which were properly marked for Mr. Parker in the democratic or citizens' column, or both, were rejected because opposite the *blank* for mayor on the so-called "independent ticket," and in the square provided for that purpose, a cross-mark was also placed. If the result had been affected, I would have dissented from the decision of the court in excluding them. The ballots were not disfigured or mutilated. They were neither in terms nor by fair implication denied enumeration under the provisions of section 25, and it cannot reasonably be deduced that the crosses so made were intended to serve as distinguishing marks, so as to place such ballots under the ban of section 27.

The decision in the case of *Farnham v. Boland*, 134 Cal. 151, 66 Pac. 200, which holds adversely to the views above expressed, was in fact rendered under a statute widely different from ours, and is not pertinent.