Bechtel v. Albin.

———————◆———————

No. 16,193.

BECHTEL v. ALBIN.

JURISDICTION.—*Contested Election Cases.*—*Statute Construed.*—*Statute Repealed.*—The act of March 6th, 1889, was not designed to embrace all of the subjects and incidents relating to elections, the holding of office, and the exercise of official functions and duties. It expressly repeals only such laws as are inconsistent with its provisions, and the subject of contests not having been included in its terms, may not be said to be inconsistent with its provisions, and jurisdiction of contested election cases has not been disturbed by it.

Bechtel *v.* Albin.

ELECTIONS.— *Stamping Ballot.— Requirements of Voter.* — The rules for stamping ballots, as prescribed in the election law of 1889, are mandatory, and must be strictly observed. The requirements of the voter are not unreasonable, and do not affect his right to vote, but simply prescribe the manner of exercising such right. If in the attempted exercise of the right there is manifestly an effort to comply in good faith with the statutory requirements, a reasonable compliance with the statutory rules will be sufficient, and a defect in the paper used for the ballot, without the evident fault of the voter, will not vitiate the ballot.

From the Elkhart Circuit Court.

*C. W. Miller* and *H. D. Wilson*, for Appellant.

*A. Deahl, J. D. Osborne* and *A. S. Zook*, for appellee.

HACKNEY, J.—The appellee John W. Albin prosecuted this proceeding to contest the election to the office of county commissioner for the South District of Elkhart county, of the appellant Jeremiah Bechtel, by filing with the auditor of said county a written statement specifying the grounds of contest, and verified by the oath of the appellee. The statement of contest set forth the candidacy of the appellee, the appellant, and one John V. Crabb for said office from opposing parties; that the several candidates were eligible, and that of the votes received and counted in said election, being the general November election of 1890, said Bechtel received 4,109, said Albin received 4,092, and said Crabb received 322. But it is further stated that there were 48 legal votes cast for said Albin, in the various precincts named, which the several election boards in said precincts wrongfully refused to count in his favor, and that if said 48 votes had been counted in his behalf, he would have been given a plurality of all the votes cast, and over the votes cast for said Bechtel of 31.

The precincts and the number of ballots excluded in each are set forth in detail, and it is stated that the ballots so rejected and omitted from the votes cast for the

Bechtel *v.* Albin.

appellee were each and all protested, preserved, and returned as required by law.

After notices and the assembling of the board of county commissioners to hear the contest, the contestee demurred to the statement, which demurrer was sustained, and thereupon the appellee appealed to the Elkhart Circuit Court, where the contest was heard by the court, and a special finding of facts and conclusions of law were stated in favor of the appellee. The appellant excepted to the conclusions of law, moved for a new trial, excepted to an adverse judgment, and appeals to this court for review.

There are five assignments of error:

1. The court erred in overruling appellant's motion to dismiss for the want of jurisdiction.

2. The court erred in overruling the motion to make the complaint more specific.

3. The court erred in overruling the motion to strike out parts of the complaint.

4. The court erred in overruling the demurrer to the complaint.

5. There was error in each conclusion of law upon the special facts found.

The discussion includes questions upon the exclusion of certain offered oral evidence, and the admission of the certificate of the board of canvassers as to the number of votes undisputed which were counted for the contestant. The motion for a new trial did not assign as causes therefor the action of the court in admitting or in rejecting the evidence complained of, nor is the overruling of the motion for a new trial assigned as error.

The second and third assignments of error are not discussed, therefore the questions for consideration by this court are:

*First.* The existence or nonexistence of jurisdiction in the commissioners' court and circuit court to enter-

tain proceedings in contest of an election to a county office, as that question is presented upon the first and fourth assignments of error; and,

*Second.* The correctness of the court's conclusions of law upon the facts specially found.

We will dispose of these questions in the order stated.

Prior to March 6th, 1889, the date of the act known as the Australian Election Law, it was provided by article 5, chapter 56, R. S. 1881, sections 4743 to 4768, inclusive, for the contest of elections. Section 4758 is as follows:

"All contests for county and township offices shall be tried in the proper county; and all contests for district and circuit offices, not otherwise provided in this act, shall be tried in the county giving the largest vote for such office at such election; and whenever any elector shall choose to contest such election, he shall file with the auditor of the proper county, within ten days after such person has been declared elected, a written statement specifying the grounds of contest, verified by the affidavit of such elector."

Sections 4759, 4760, and 4761 provide for notice to the contestee and to the commissioners; for the trial of the issue by the commissioners, and the rules of procedure in such trial.

Section 4762 provides for an appeal to the circuit court from the decision of the commissioners.

Section 4768 provides for an appeal to this court from the decision of the circuit court.

The act of March 6th, 1889, was not designed to embrace all of the subjects and incidents relating to elections, the holding of office, and the exercise of official functions and duties. It expressly repeals only such laws as are inconsistent with its provisions, and the subject of contests not having been included in its terms,

may not be said to be inconsistent with its provisions. Elliott's Supp., sections 1323 to 1389, inclusive.

It was certainly not intended that the action of the election officers in rejecting a ballot should be final and conclusive. The required preservation of the disputed ballots sufficiently attests this conclusion. By the language of section 1374, Elliott's Supp., recognition of an existing right of contest is given in the provision that "in any contest of election, such ballots and seals may be submitted in evidence." No appeal from decisions of the election board is provided for by the new act, and none existed before. An original method of correcting errors and abuses of the election boards, where the right to an office depended upon such action, existed before the Australian law, and has not been repealed or substituted. The right of contest by that method still exists. The tribunal possessing jurisdiction to hear such contest was designated, and its proceedings were defined. That jurisdiction has not been disturbed, and it was, in the case in review, properly invoked.

As we understand the appellant's contention, it is that the act of March 6th, 1889, repeals the former law giving the right, and defining the mode of contesting elections. We do not agree with this view.

The special finding, after stating the candidacy of the appellant, the appellee, and said Crabb, their eligibility, the number of votes counted for each by the election board, as alleged in the complaint, the form of the ballots, the return of the disputed ballots in properly sealed and enclosed bags, and their preservation, further states that, in the various precincts in question, eighty ballots were not counted, but were disputed, and so returned. The finding thus states the character of the ballots so rejected in fifty-six specifications.

It is concluded by the court, that sixteen of such bal-

lots should have been, and were, correctly rejected; that forty-two of said ballots should have been counted for the appellee; that seventeen of said ballots should have been counted for the appellant; that three of said ballots should have been counted for said Crabb; that one of said ballots was for the People's ticket, and one was for a candidate for congressman only.

The seventh conclusion of law by the court was, "That the whole number of legal ballots cast for said three respective candidates for county commissioner, South District, of Elkhart county, State of Indiana, at the general election in 1890, were as follows: For this plaintiff, John W. Albin, 4,134; for this defendant, Jeremiah Bechtel, 4,126; for said John V. Crabb, 225."

The eighth conclusion of law is, "That the plaintiff, John W. Albin, received more legal votes and ballots for said office than any other person, and was duly elected thereto."

Counsel devote much space in their briefs to a discussion of technical objections to the form of the court's finding, and probably some of the objections would merit our consideration, but we find the original ballots in the record, and the appellee insists that we decide the case upon the rights of the parties without regard to errors not affecting the substantial rights of the parties, and we hope to be able to do so. However, the occasion should not pass without remark that the trial judge is not required to write legal opinions to become a part of the record in a cause. The office of a special finding does not permit dissertations upon questions of law or of fact, nor of the personal views of the judge.

Of the ballots in question, fifteen were stamped within the column bearing the title "Republican Ticket," but not upon any square provided for stamping, and five of which were stamped upon the names of candidates.

Eleven of the ballots disputed contained no stamp marks, while seven were stamped upon the square of each of two or more parties.

Two ballots were stamped within the column bearing the title "Prohibition Ticket," but not touching any square provided for stamping.

Eleven of the ballots may be classed as mutilated, and containing distinguishing marks, as follows:

No. 8 had ink rubbed over each name in the Democratic ticket and Prohibition ticket. No. 10 had two blots of ink in the upper left hand corner, on the face of the ticket, apparently made with the finger, and bearing no stamp. No. 20 having large check-marks in pencil, opposite the names of two candidates, whose names are also stamped. No. 40 being blurred on the square opposite the title of the "Republican Ticket," and upon the name of the Democratic candidate for clerk, as if with some instrument other than the stamp of the precinct, which, from the other ballots of the precinct, appears to have been a star. No. 49 contained only a slight ink stain on the square opposite the head of the ticket, manifestly applied with the point of the finger. No. 63 was stamped at the head of one ticket in the proper square, and a name upon another ticket blurred by drawing the inked stamp over it. No. 64 had the entire title and square at the head of the Democratic ticket hidden by rubbing ink over it. No. 69 had a hole torn in it, within the column of the Prohibition ticket, about one inch in length by one-fourth of an inch in width. No. 72 had an angular piece torn from the bottom of the ticket, destroying the square opposite the last name in the Prohibition ticket. No. 76 had a name written in pencil over the eagle, and had many blots of ink upon its face. No. 39 was stamped at the head of the Prohi-

bition ticket and opposite the Democratic candidate for clerk, evidently with the butt of the stamp.

Of the protested tickets there were five stamped within the column of the Democratic ticket, but nearer to the square at the head of the Republican ticket than to the square immediately preceding the title of the Democratic ticket.   One Republican ticket was so stamped that the square opposite each of its candidates was touched with the stamp, except that in like manner the square opposite the name of the Democratic candidate for recorder was stamped.

On ticket numbered 58, the stamp touched slightly the lower side of the square at the head of the Democratic column.

Ballot numbered 28, in the column of the People's ticket, had a slight hole, probably one-sixteenth of an inch in diameter, and, manifestly, not purposely torn, but appearing to have dropped out from a defect in the paper, the quality of the paper being poor, and the place where the hole is located being very thin.   It is so slight as to have hardly been discoverable from a casual observation, and was such as could have occurred in folding or unfolding the ballot.

The three tickets last named we regard as in substantial compliance with the law, and as not containing distinguishing marks or mutilations.

To require that the stamp should have been immediately over the square is not only more than the language of the act requires, but is certainly not within the spirit of the act. If in the attempted exercise of the right there is manifestly an effort to comply in good faith with the statutory requirements, it would be little less than disfranchisement to hold that its accomplishment must turn upon the exactness with which the center of the square is met with the center of the stamp.   It would be no

Bechtel v. Albin.

less a disfranchisement to require the voter to insure the quality of the paper upon which his ballot is printed, and that a defect in it is not such as that a slight abrasion may occur in the handling incident to casting and canvassing the ballot.

The remaining ballots, not particularly mentioned, contained impressions of the stamp within the column occupied by the Democratic candidates, and varying in distances from the square immediately preceding the title, from one-fourth of an inch to an inch and one-half.

There being but one impression of the stamp upon any one of such, excepting two, it is obvious that the voters, in preparing them, did not attempt to indicate their choice of candidates "by stamping the square immediately preceding their names," as required by the act. Elliott's Supp., section 1367. However, the voter had, by said section, this privilege: "If he shall desire to vote for all candidates of one party or group of petitioners, and none other, he may place the stamp on the square preceding the title under which the candidates of such party or group of petitioners are printed, and the vote shall then be counted for all the candidates under that title, unless the names of one or more candidates under another title shall also be stamped, in which case the names of the candidates so stamped shall be counted." It remains to be determined whether this method of choosing was adopted.

Of the Democratic tickets stamped near the square at the head of the ticket were two containing stamps opposite the names of candidates for offices upon the Republican ticket, not including the name of the appellant.

To give appellant the vote undisputed, 4,109, and add the one we have held valid, together with the ten of the class stamped at various distances from the square at the

title, and we have 4,120 votes.   To give the appellee the vote undisputed, 4,092, and add the two we have held valid, together with the 26 of the class stamped at varying distances from the title square on the Democratic ticket, and we have 4,120 votes.   If, therefore, the 36 ballots, whose stamps do not touch any square, are held deficient, the appellee would lack 18 votes of possessing a plurality.   When we recall the practices which were claimed to exist, demanding secrecy not only for the protection of the honest many in casting their votes, but for their protection against the dishonest few voters and bribers; when we remember the artifices then said to exist for corrupting the ballot, and against which the new law was designed to protect; observing the causes which brought the new law into existence, and viewing its elaborate details, we find that the great underlying object was to avoid the possibility of discovery, from the ballot, of the identity of the voter.   In the form, the printing, the distribution, the preservation, the countersigning of the ballots, the spurious ballots have been taken from the methods of election manipulation.   In the adoption of the booth, the stamp, the folding, the identity of the voter is hidden.   With the former, the voter has no charge, while with the latter he is expressly charged.

By the fifty-second section of the act (Elliott's Supp., 1374) it is provided that " any ballot which shall bear any distinguishing mark or mutilation shall be void and shall not be counted, and any ballot or part of a ballot from which it is impossible to determine the elector's choice of candidates, shall not be counted as to the candidate or candidates affected thereby."

The stamp may certainly be used in a manner to give distinction to the ballot.   Some definite rule must exist to determine whether its use is for the purpose of dis-

tinguishing the ballot or is in the legitimate indication of the voter's choice.

It was not the intention of the Legislature to leave the question for the determination of the election board, for it is. a well known fact that political excitement and partisan strife had become so intense that impartial decisions were not always possible. Nor was there reason to leave a question of such importance to depend upon the liberality of construction in one precinct and the strictness of construction in another. And there was less reason to have left the decision to turn upon the distance of the stamp mark from the square, for, in that event, if a quarter of an inch was near enough, why not twice that distance or thrice that distance, or, as in a number of the instances here involved, one and one-half inches? The only rule, free from the embarrassments we have suggested, is that provided by the letter of the enactment. By the acts of 1889, section 45, the voter may "indicate the candidates for whom he desires to vote by *stamping the square* immediately preceding their names * * * *Provided, however*, That if he shall desire to vote for all candidates of one party or group of petitioners and none other, he may *place the stamp on the square* preceding the title under which the candidates of such party or group of petitioners are printed." None of the requirements of the voter are unreasonable, and none of them affect his right to vote; they simply provide the manner of exercising the right. The voter has no greater right to stamp his ballot in a manner different from that prescribed than he has to decline to go into the booth to stamp it.

That the Legislature intended a strict observance of the rule so provided is further shown in the provision that if, in an attempted compliance, the voter, by accident or mistake, spoils, defaces, or mutilates his ballot, he can have another.

As said in *Kirk* v. *Rhoads*, 46 Cal. 398, if the voter willfully disregarded the requirement of the law in the preparation of the ballot, it should be rejected. ''He can see, for instance, that his ballot is free from every mark, character, device, or thing that would enable any one to distinguish it, etc.'' We may add that he shall not disregard the important provision that the squares are prepared for the indication of his choice, and that no other means is prepared. That the requirement is mandatory, and not merely directory, has been decided by this court in *Parven* v. *Wimberg*, 130 Ind. 561, and the question should no longer be regarded as doubtful.

The judgment of the lower court is in all things reversed, with instructions to issue to the appellant a certificate of election.

Filed April 4, 1893.