## STATE OF INDIANA, EX REL. SCHELLERT, *v.* THORNBURG.

[No. 21,834.   Filed February 20, 1912.]

1. APPEAL.—*Presentation of Grounds of Review.*—*Motion for New Trial.*—*Venire de Novo.*—*Questions Not Properly Presented.*— Where the question as to the alleged findings of the court being conclusions is not presented by a motion for a *venire de novo,* and neither the failure of the court to make a special finding on motion therefor, nor the overruling of such motion, is assigned as a cause for a new trial, no question as to such matters is properly presented on appeal. p. 181.

2. ELECTIONS.—*Preservation of Ballots.*—*Purpose.*—*Contests.*—The preservation of ballots voted and not voted, together with all disputed or uncounted ballots, as provided by Acts 1909 p. 162, amending former laws on the subject, is for the purpose of re-examination on application for a recount or on contest. p. 183.

3. ELECTIONS.—*Returns.*—*Prima Facie Evidence of Result.*—The policy of the election law subsequent to 1881 and prior to 1909 was to render the return of the election and canvassing boards *prima facie* evidence of the result of an election, and conclusive except for fraud, and as to the protested, disputed and un-counted ballots. p. 183.

4. ELECTIONS. — *Recount.* — *Preservation of Ballots.* — *Statute.* — Sections 35 and 36 of the act of 1881 (Acts 1881 [s. s.] p. 482, §§6954, 6955 Burns 1908, §§4713, 4714 R. S. 1881), providing the manner for preserving ballots, have not been repealed, and the acts of 1889, 1891, 1897, 1901 and 1909, are to be construed in *pari materia* with the provisions of the act of 1881, so far as consistent with it, as reasonably parts of one general system of law on the subject of elections. p. 183.

5.  ELECTIONS.—*Ultimate Decision.—Ballots.*—An election is ultimately decided by the ballots, and not by the certificate of election, and the candidate receiving the highest number of legal votes is entitled to the office.   p. 184.
6.  ELECTIONS.—*Preservation of Ballots.—Presumption.*—It will be presumed that ballots were honestly preserved after an election, in the absence of any specific evidence that they have been tampered with.   p. 186.
7.  ELECTIONS.—*Ballots.—Distinguishing Marks.*—The rule against distinguishing marks should not be so rigid as to disfranchise an honest voter where it is merely possible that a third mark in the cross on a ballot was intended as a distinguishing mark instead of being the result of the voter's effort to make the cross more distinct.   p. 187.
8.  ELECTIONS.—*Ballots.—Mutilation.*—A ballot showing that the voter marked in the square opposite the name of a candidate and then erased the mark and the party designation within the square, and marked in the square opposite the name of the opposing candidate, is clearly a mutilated ballot and should not be counted.   p. 189.
9.  ELECTIONS.—*Ballots.—Distinguishing Marks.*—A ballot is not objectionable where it shows that a peculiarity in the cross was due to the lack of equal pressure on the pencil in making the strokes.   p. 190.
10.  ELECTIONS.—*Ballots.—Distinguishing   Marks.—Mutilation.*—A ballot having an alleged distinguishing mark which is shown to be a spot or defect in the paper, and an alleged mutilation consisting of a blur on the cross, as if a slightly soiled finger had been rubbed over it, is not objectionable and should be counted. p. 190.
11.  ELECTIONS. — *Ballots.* — *Distinguishing Marks.* — *Inartistic Crosses.*—A ballot is not objectionable merely because the cross is not artistically made, but allowance should be made for age, infirmity of sight, unsteadiness of hand, inability to write well, or to make straight lines, cramped position in marking ballots, and perhaps other reasons.   p. 190.

From Jay Circuit Court; *H. J. Paulus,* Special Judge.

Action by the State of Indiana on the relation of Charles F. Schellert against William O. Thornburg.   From a judgment for defendant, the relator appeals.   *Affirmed.*

*Smith & Fleming* and *Jay A. Hindman,* for appellant.
*Frank B. Jaqua* and *George T. Whitaker,* for appellee.

MYERS, J.—Action in *quo warranto* to test the title to the office of city treasurer of the city of Dunkirk.

Relator and appellee were candidates at the November 2, 1909, election for the office of city treasurer of the city of Dunkirk. Both were eligible. The canvassing board certified that relator had received 403 votes and that appellee had received 402 votes. A recount was had, and the result was a certificate that appellee had received 401 votes and relator 400 votes, and appellee received possession of the office and papers, denied the right of possession in relator, and, upon proper demand, this action was brought. The complaint is in the usual form. Appellee answered in general denial, and in four additional paragraphs. A demurrer was sustained to the second paragraph.

The third paragraph alleges that relator received 400 legal votes and appellee 401 legal votes, and a majority of the legal votes.

The fourth paragraph, while going into some detail, is grounded on the allegation that the canvassing board committed a mistake in canvassing the returns, and that if the returns and certificates are amended to show the facts, it would appear that each of the parties received 403 votes, but that appellee received a majority of the legal votes.

The fifth paragraph admits that the returns and the certificate of the canvassing board gave the relator 403 votes, and appellee 402 votes, but that, by mistake, the election board in one ward failed to count one legal ballot cast for appellee, and in another ward counted one too many ballots for relator, and, in casting up the totals, by mistake failed to count one ballot cast for appellee; that the election board in each of the three wards correctly determined all ballots that should or should not be counted, and correctly decided all questions pertaining to marked, mutilated or disputed ballots, and that appellee received a majority of the votes cast for the office of treasurer at such election.

On this state of the record there was a request for a

special finding of facts and conclusions of law. The finding of facts was that defendant received a majority of all the legal votes cast; that relator tendered and filed the requisite bond and that it was approved, but was not acknowledged by relator, or any one else who had signed it; that appellee on January 3, 1910, took the oath of office as treasurer for the term of four years from 12 o'clock, noon, January 3, 1910.

The conclusions of law were that relator take nothing, and that appellee recover his costs. Exceptions were reserved to the conclusions of law, and, over a motion for a new trial, judgment was rendered for appellee, and the errors assigned are as to the conclusions of law, and the overruling of the motion for a new trial.

No question is properly presented as to the alleged findings being conclusions, so as to warrant a reversal of the judgment, for the reason that there was no motion

1. for a *venire de novo,* nor was the failure of the court to make a special finding on relator's motion assigned as cause for a new trial, nor is the alleged failure to make a special finding of facts on relator's motion treated as overruling such motion assigned as cause for a new trial, or the question presented in any way, though a judgment might not be warranted in some cases on a finding of this character. So that the question presented arises on the motion for a new trial, assigning as causes therefor that the finding is not sustained by sufficient evidence, and is contrary to law and error in the admission of evidence; and as the former causes depend for their solution in some degree upon the last, we will consider it first.

Relator introduced in evidence the return and certificate of the board of election commissioners, which shows 403 votes cast for relator and 402 votes cast for appellee. To overcome the *prima facie* case thus made, appellee read in evidence, over the objection of relator, a record of proceedings in the Jay Circuit Court for a recount of the

ballots, as between relator and appellee, upon *proceedings* instituted by the latter. Appellant's point is, that under then existing laws there could be no recount, for the reason that §§61-65 of the general election act of 1881 (Acts 1881 [s. s.] p. 482, §§4738-4742 R. S. 1881), were repealed by §§51, 52, 57 of the act of 1889 (Acts 1889 p. 157, §§51, 57 now appearing as §§6933, 6939 Burns 1908, and §52 having been superseded by Acts 1897 p. 49, §7, as amended by Acts 1901 p. 525, §6934 Burns 1908), and that the amended act of 1909 (Acts 1909 p. 162) did not revive the provisions for a recount. By §32 of said act of 1881 (§4710 R. S. 1881), provision was made for stringing all ballots on a thread of twine. By §35 (§4713 R. S. 1881) the ballots, with one of the lists of voters and one of the tally papers, were required to be carefully sealed, and to be delivered by the inspector to the clerk of the circuit court, and §36 (§4714 R. S. 1881) provided for their safekeeping. The board of canvassers was by §37 (§4715 R. S. 1881) required to canvass the returns and to certify the results. Section 61 (§4738 R. S. 1881) provided for a recount. The general subject of elections was covered by a new act in 1889 (Acts 1889 p. 157), with a general clause repealing, *pro tanto,* all laws inconsistent therewith.

By §52 of said act of 1889 all ballots which were protested, and all disputed ballots were required to be preserved, and the remainder were required to be destroyed by totally consuming them by fire. In 1891 certain sections of the act of 1889, including §52, were amended (Acts 1891 p. 124). In 1897 (Acts 1897 p. 49) a general act was passed, by §7 of which provision is made for preserving all protested, disputed and uncounted ballots, and all others were to be totally destroyed. By an act of 1901 (Acts 1901 p. 525, §6934 Burns 1908) §7 of the act of 1897 was amended so as to authorize watchers at the canvass of the vote. Thus the matter stood when the act of 1909 was passed (Acts 1909 p. 162), which amended §7 of the act of 1897, *supra,* as

amended in 1901, *supra,* so as to provide for the preservation of all ballots voted and not voted, together with all protested, disputed or uncounted ballots, and proper indorsement by the poll clerks of the ballots "counted," and "not counted."

What could have been the purpose of preserving protested, disputed and uncounted ballots, if it was not to enable a reëxamination of them to be made on application for a recount, or upon contest. It seems to us that the fact that such provision was made is a fair indication that it was for the purpose of their being reviewed, otherwise they might as well have been destroyed with the others, and it has been held that to the extent that it was applicable to protested, disputed and uncounted ballots, the contest law was not repealed. *Bechtel* v. *Albin* (1893), 134 Ind. 193, 33 N. E. 967.

The same reasoning is applicable to the statute with respect to a recount, and the language of the repealing act of 1889, *supra,* seems so to imply.

The policy of the election law subsequent to the act of 1881, and prior to 1909, was clearly to render the return of the election board and the canvassing boards conclusive except for fraud, and except as to the protested, disputed and uncounted ballots, and *prima facie* evidence of the result of an election, and this has been the view of the courts. *Hoy* v. *State, ex rel.* (1907), 168 Ind. 506, 81 N. E. 509, and cases cited; *Hall* v. *Campbell* (1903), 161 Ind. 406, 68 N. E. 892; *Weakley* v. *Wolf* (1897), 148 Ind. 208, 47 N. E. 466; *State, ex rel.,* v. *Shay* (1885), 101 Ind. 36; *Bolton* v. *Clark* (1904), 162 Ind. 471, 68 N. E. 283; *People, ex rel.,* v. *Board, etc.* (1892), 19 N. Y. Supp. 206.

Appellee, however, contends that by the same reasoning, as to repeal urged by appellant §§35, 36 of the acts of 1881 (Acts 1881 [s. s.] p. 482, §§6954, 6955 Burns 1908, §§4713, 4714 R. S. 1881), which is the only

statute providing for the manner of preserving the ballots, should be held to have been repealed, and hence there was no statute in force requiring that the ballots be preserved. We think this position is untenable.

The acts of 1889, 1891, 1897, 1901 and 1909, *supra,* are to be construed in *pari materia* with the provisions of the act of 1881, so far as consistent with it as to the questions of recount, contest and custody, and the preservation of the ballots and papers, which, under the various acts, are required to be delivered to the clerk of the circuit court, as reasonably parts of one general system of laws on the subject of elections.

The act of 1897, *supra,* contained a repealing clause as to conflicting enactments. Neither the act of 1901 (Acts 1901 p. 525), nor the act of 1909 (Acts 1909 p. 162), contained a repealing clause, though the title of the act of 1901, *supra,* embraced the subject of repeal; the acts were amendments only.

The statute providing for a recount is still in force, so far as applicable, where the ballots have been preserved.

5. An election is ultimately decided not by the certificate of election, but by the ballots, and the eligible candidate receiving the highest number of legal votes is entitled to the office. *State, ex rel.,* v. *Shay, supra.*

The question then is, Is the *prima facie* case made by the return and certificate of the canvassing board overcome by the evidence in the case? The board certified 400 votes for appellee. The ballots voted, and those disputed, protested, counted and not counted were preserved and delivered to the city clerk, who at the time was appellee. The package was placed in a vault, which was used jointly by appellee as city clerk and the city treasurer, each of whom had the combination to the vault and keys to the inside lock, and appellee, since January 3, 1910, as treasurer, has had access to the vault, and it was possible for other persons to go into the vault.

At the time of the recount, the paper bag containing the ballots, tally sheets and poll sheets and other papers were taken by appellee to the city of Portland, some fifteen miles away, upon notice, and the bags there were opened by the recounting board in the court room, then resealed, and taken by appellee to Dunkirk; and other persons were in and about the room during the recount.

There is evidence that the package, which contained the ballots from the first ward, was unsealed when brought to the city clerk's office, and that the officers required the inspector to seal it in their presence.

The papers were in the custody of appellee, as clerk, until noon of January 3, 1910, and thereafter in the possession of his successor, who produced them on the trial, and testified that, so far as he knew, they were in the same condition as when he received them, and that while he did not look at them daily, he kept track of where they were daily, and that except on one occasion, when the ballot packages were examined by one of the attorneys for appellant, when appellee was present, he had had possession of them, and they were not examined or tampered with by any one, so far as he knew.

Exhibit fourteen was a ballot package from the first ward, containing unvoted ballots, and was kept with the other packages. This witness thinks it was unsealed when handed over to him.

Appellee, as custodian of the papers from the day of the election until January 3, 1910, testified that all papers were turned over to him sealed, except exhibit fourteen, and that he had never tampered with them, and no one else had to his knowledge.

The ballots voted were in packages or sacks marked exhibits four, five and six, being the ballots voted in the first, second and third wards respectively. These ballots were put in new packages, as were the seals from the old pack-

ages, and resealed by the commissioners for a recount, in separate packages as to each ward.

One of the election clerks testified that at one place on his tally sheet, by mistake he made five vertical marks, and one diagonal mark; that only five votes were represented by the five vertical marks and the diagonal mark, and only five votes were counted; that the diagonal mark was used to tie the five vertical ones together; that his attention was called to it by the other clerk, and, instead of erasing it, he announced that he could just tally anyhow; and that the other tally sheet shows five ballots. He was corroborated by the other clerk.

The tally sheet is corroborative of the fact, in that it shows five votes counted for the six marks, and it is, under this evidence, that appellee claims one vote.

By reason of the claim that there was no statute in force authorizing a recount, and that the handling and use of the ballots and papers since the election, their being carried from Dunkirk to Portland on the occasion of the recount, and the packages having been opened by unauthorized persons, and the possibility that the ballots might have been handled or tampered with, appellant contends that the papers and ballots have not been preserved with such care that the ballots could have any force as evidence, and that their value as evidence is thereby destroyed, and objection to their introduction is made on this ground, as to most of them, which will be hereafter designated as the general objection, to avoid repetition. The objections seem to us to go rather to their weight than their admissibility.

6. What are claimed to be the original ballots are before us. In the absence of any specific evidence as to their having been tampered with, we are bound to presume that they have been honestly preserved as they came from the hands of the inspectors.

The undisputed ballots show 378 ballots for relator and

379 ballots for appellee, and all the ballots were given or offered in evidence by appellee.

The contention of the parties centers on the following ballots: The first, 801, has a cross under the device within the circle on the ticket on which the name of appellee appears as the candidate for city treasurer. The objection made was that the ticket was torn and mutilated. The alleged mutilation consists of a half elliptical indentation in the paper, near the center of the ballot, extending through it, and with the edges of such character as to indicate a flaw in the paper itself, of which we entertain no doubt.

7. The objection to ballot 802 is that in making a cross the voter made three strokes instead of two, thereby making a distinguishing mark. This marking is under the device within the circle on the ticket. It is manifest that there are three strokes of the pencil, one from the top to the left, one from the top to the right, and a second close to, and parallel with the latter, to, and slightly beyond, the point of crossing the first oblique line, where it turns slightly, and is on the same alignment with the second line, and near the end diverges slightly. It appears as if the voter had not been sure of the second mark, and had attempted to make it more distinct, though it is possible that it may have been intended as a distinguishing mark, but the rule should not be so rigid as to disfranchise an honest voter on a mere possibility.

Objection is made to ballot 803, that there is a hole through the ticket, and that there is no cross to indicate the voting; simply a check mark like a V. This ticket was a mixed ticket, and as to the hole, it is similar to the holes, and in about the same relative position as like holes, in the ballots that were voted and counted, from the second ward, and the evidence is that they were strung. As to the other particular, while the two down legs of the X are left off opposite a name, the square was small and there was but

little room for marking, and the marking extended to the margin of the square. To ballot 804 there was no specific objection, simply a general objection to its admission. Ballots 805, 806, 807 and 808 were given in evidence without objection, and each on a strict construction would not be counted, for the reason that three lines are used in marking. Each is a ballot for relator if counted, and each has the similar marking in the party device which is pointed out at 802. Ballot 809 was objected to on the general grounds stated, and for the reason that the mark opposite the name of the candidate for mayor is not a cross, but represents the letter W. Inspection of the ballot discloses that it is a mixed ticket, with a marking in the square opposite the name of the candidate for mayor on one ticket showing three lines as in the case of 802, 805, 806, 807 and 808, and if counted would be counted for appellee. Ballot 810 was objected to for the general reason pointed out. It was a mixed ticket, which, if counted, would be counted for appellee. In the device opposite the name of the candidate for mayor, the indication is that one stroke of the pencil made a light line, and it was attempted to make it more distinct and, the first was not identical with it; and in case of one other name the cross indicates two strokes or partial strokes in drawing each line of the cross. It is the bottom name on the ticket, and indicates a cramped position of the hand in drawing.

The objection to 811 is practically the same as to 809 and 810. This ballot, if counted, would be counted for appellee. At the lower name on the ticket there are two lines crossing the third: One of these lines is not distinct through part of its length, as if the pencil failed to mark, and the object seems to have been to make it distinct, but the second line departs slightly from the first.

Objection to 812 is the general ground, and on the additional ground that the mark opposite the name of one of the candidates for mayor is not a cross, and the mark oppo-

site another name is a straight line, and not a cross, and is a distinguishing mark. The mark as to the candidate for mayor is not a cross with equal arms, but it is a cross, and as to the other instance, the mark is made the same, but is less well-defined than the first, but we are able to discover a cross, one line of which is distinct, the cross-line distinct, but with one slight extension beyond the other line. This ticket should be counted for appellee. As to 813, a general objection is made, and the further reason is given that opposite one name on the ticket the mark is not a cross, but an anchor. It does show that slight resemblance, clearly owing to one arm not being carried well beyond the other, and the latter slightly curved. We have no doubt as to this ballot being one which should be counted for appellee, so far as the marking is concerned. Ballot 814 is objected to on the general grounds, and on the ground of an alleged distinguishing mark opposite three names, one of which is that of appellee. Four of the six markings on the ticket indicate slight pressure of the pencil, but we have no difficulty in discovering a cross in each instance and the ticket is not open to the objection of containing any distinguishing mark, and should be counted for appellee.

As to 815, the general objection is made, and the additional one that it contains a distinguishing mark, in that it is claimed that as to one name the character is made by three distinct lines instead of two, and an inspection of the ticket shows this to be true, and that it is in the same condition as 802, 805, 807, 808 and 809.

Ballot 816 was mutilated by the voter's first marking in the square opposite the name of relator, and then erasing the mark and the party designation within the square, and marking a cross in the square opposite the name of appellee. This was clearly a mutilated ticket, and should not be counted, and was not counted by the court. Objection is made to 817, on the general ground that in the cross opposite one name there is claimed to be "some

kind of a hieroglyphic.'' Careful examination discloses this to be a cross rendered somewhat peculiar by reason of lack of equal pressure on the pencil in marking the strokes, and the ballot is not objectionable on that ground as a ballot for appellee. As to ballots 818, 819, 820, 821, 822, 823 and 824, the objection is the general one, and they are all ballots for relator. Ballot 825 has the same characteristics as 802, 805, 806, 807, 808, 809, 810 and 811, as a ballot for relator. Ballot 826 was objected to for the general reason, and for the specific reason that the mark in the circle is not a cross, and has been erased and discolored, and some other character placed near it of a different color from the pencil mark. As to the alleged character, it is shown to be a spot or defect in the paper. The cross is blurred, as if a slightly soiled finger had been rubbed over it, but has a sufficient designation as a cross to be counted as a ballot for appellee.

Ballot 827 is challenged because of an alleged distinguishing mark in the square opposite appellee's name. This again appears to arise from the difference in the pressure applied to the pencil in different portions of the marking. Ballots 828 and 829 are objected to on the general grounds, and are ballots for the appellee, if counted. Ballots 830 and 831, aside from the general objection, are objected to as ballots for appellee, because the cross opposite appellee's name in one instance, and in the square opposite the name of another candidate in another instance, are not such crosses as the statute requires. They are not as artistically made as some persons might make them, but allowance must be made for age, infirmity of sight, unsteadiness of hand, inability to write well, or even to make straight lines, cramped position in marking ballots, and perhaps other reasons. We see no well-founded objection to these two ballots as being properly cast for appellee. As to ballot 832, the condition of the ticket is the same as 802. As to ballots 835, 836, 837, 838, 839 and 840, cast for relator,

and ballot 835 cast for appellee, the objection is the general one. As to ballot 834, the objection is similar to ballots 802, 815, 816 and 832, all attempted to be cast for appellee.

Ballots 840½ to 847, both inclusive, were objected to for the general reason, and also as bearing distinguishing marks, and were not counted. In ballot 847 all marks are entirely outside the square. Ballot 846 is a straight ticket, with a cross within the circle containing the device, but on the back, containing a cross within the area embraced within the circle of the opposite party device. Ballot 845 has the same vice as ballots 802, 805, 815 and 832. Ballot 844 contains slight marks attached to the cross in the square opposite one name, which cannot be readily described, but indicate a trembling hand, and which are not of sufficient character to indicate anything as a distinguishing mark, and should be counted for relator. Ballot 843 contains four clearly-defined lines in making the cross in the circle at the head of the party ticket. In 842 one square has one straight line with no pretense of a cross, and in another square three lines in making the cross. Ballot 841, on its face clearly shows markings by a trembling and unsteady hand, but at the same time an honest effort to comply with the law, and should be counted for relator, as should ballot 840½, in which the lines are straight, but in two instances slightly indistinct but still visible.

Ballots 801, 803, 804, 812, 813, 814, 817, 818, 826, 827, 828, 829, 830, 831, 833, and 835, sixteen in number, should clearly be counted for appellee. Ballots 819, 820, 821, 822, 823, 824, 836, 837, 838, 839, 840, 840½, 841 and 844, fourteen in number, should clearly be counted for relator. Ballots 802, 809, 810, 811, 815, 832 and 834, seven in number, cast for appellee, and 805, 806, 807, 808, 825, 845, 846 and 847, eight in number, cast for relator have the same characteristics, having a cross made with three or four lines. Ballot 816, cast for appellee, and ballots 842 and 843, cast for relator, are illegal, as having distinguishing marks.

If we eliminate from each of the parties the ballots which have the similar characteristics of having three or four distinct lines in making the cross, we should have added to appellee's uncontested vote of 379 sixteen ballots, and to the uncontested vote of relator 378 fourteen ballots, which would leave the situation with a total vote of 395 for appellee and a total vote of 392 for relator.

If we give to each of them the ballots which bear the same characteristics, that is, three or four distinct lines in marking the crosses, we should add seven votes to the above vote of appellee, and eight votes to relator, making appellee's total vote 402, and relator's total vote 400.

If we should give to each of them every ballot apparently cast for them, disregarding all questions of mutilation or distinguishing marks, appellee would have 406 votes and relator 405 votes.

If we deduct the two clearly incompetent ballots—842 and 843—cast for relator, and the one clearly incompetent ballot—816—cast for appellee, the result would be 405 votes for appellee, and 403 votes for relator, so that in no view of the case can relator's contention be upheld.

It would be unprofitable to extend this opinion, and the judgment is affirmed.

NOTE.—Reported in 97 N. E. 534. See, also, under (1) 29 Cyc. 755; (2) 15 Cyc. 429; (3) 15 Cyc. 418; (4) 15 Cyc. 426; (5) 15 Cyc. 425; (6) 15 Cyc. 427; (7) 15 Cyc. 359; 13 L. R. A. 761; 47 L. R. A. 820; (8) 15 Cyc. 358; (9) 15 Cyc. 359. As to admissibility in evidence of ballots to impeach election returns, see Ann. Cas. 1912B 682; 11 Am. St. 798.