**Shirley A. WRIGHT, Appellant,**

v.

**Carl O. GETTINGER, Appellee.**

**No. 781S199.**

Supreme Court of Indiana.

Dec. 8, 1981.

David W. Dennis, Dennis, Reinke & Vertesch, Richmond, for appellant.

John T. Cook and Peter D. Haviza, Winchester, for appellee.

PIVARNIK, Justice.

This is an appeal from a judgment of the Randolph Circuit Court in an election contest held in Randolph County. It involves the right and title to the office of Clerk of the Randolph County Circuit Court for the term beginning in January, 1982. The election in question was held in November, 1980, but the Clerk's office in Randolph County is a hold-over office and the one elected will not take office until January, 1982. The cause was originally filed in the Court of Appeals under No. 1–781 A 215, but was transferred to this Court pursuant to Ind.R.App.P. 4(A)(10) as a result of Appellant's Verified Petition and the granting thereof on July 27, 1981. It is docketed in this Court under No. 781 S 199.

There is very little dispute as to the facts in question. The legal questions growing out of these facts present the issues for our review.

The voting system used in Randolph County for the year 1980 was an electronic voting system (EVS), under which system the voter cast his vote by punching a ballot card with a stylus. These cards so voted in the various election precincts are thereafter counted by a computer at a central location. Enabling statutes were passed by our legislature to provide for voting under the EVS system and the state election board approved of the system employed. This cause represents the first time that legal questions involving the EVS voting system have been considered by this Court.

The election here was held on November 4, 1980, in which appellant Shirley A. Wright was the Republican candidate, and appellee Carl O. Gettinger was the Democratic candidate for Clerk of the Randolph Circuit Court. The official tallies on election night showed that Shirley A. Wright received six thousand one hundred twenty-six (6,126) votes and Carl O. Gettinger received six thousand one hundred forty-three (6,143) votes, a margin of seventeen (17) votes for Gettinger. On November 14, 1980, Shirley A. Wright filed her petition in Randolph Circuit Court for a recount and to contest said election. On December 4, 1980, the Randolph Circuit Court appointed a recount commission, which commission, on January 15, 1981, filed with the Randolph Circuit Court a certificate and report certifying that Shirley A. Wright, now the appellant, had received five thousand nine hundred eighty-five (5,985) votes and that Carl O. Gettinger, now the appellee, had received five thousand nine hundred sixty-six (5,966) votes, and that Shirley A. Wright had won the election by a plurality of nineteen (19) votes.

On January 21, 1981, appellee Gettinger filed in the Randolph Circuit Court his Verified Petition to contest said election, which was put in issue by the answer of Shirley A. Wright and by Gettinger's reply thereto.

The cause was tried by the regular judge of the Randolph Circuit Court. By written opinion entered March 11, 1981, the trial court found that Gettinger had received a total of six thousand one hundred three (6,103) votes and that Wright had received a total of six thousand ninety-one (6,091) legal votes. The trial court accordingly declared that Gettinger was elected to the office of Clerk of the Randolph Circuit Court by a plurality of twelve (12) votes.

Issues for our consideration concern the decision of the trial court in six general areas as follows: 1) permitting the counting of ballots which did not contain the initials of the poll clerks of both political parties; 2) permitting the counting of ballots which did not contain duplicate serial numbers on "re-made" ballot cards and did not contain the precinct designation on the duplicate card; 3) refusal of the court to count an absentee ballot where the punch made was insufficient to register on the electronic computer; 4) refusal of the court to permit counting of ballots where the voter voted for two opposing straight tickets and, in addition, voted for an individual candidate; 5) permitting the counting of ballots on which the voter voted one straight party ticket and then crossed over to vote for an individual candidate on the opposing ticket; and 6) consideration of ballots evidencing distinguishing marks.

## I.

It is stipulated by the parties that sixty-six ballots were cast in the November 4, 1980, election in Randolph County on which the initials of only one of the poll clerks appeared. The initials of the clerk of the opposite party were missing on the sixty-six ballots. All other ballots cast in the county bore the initials of both poll clerks. The instructions given to the members of the precinct election boards by the county election board included the requirement that both clerks must initial each ballot. These sixty-six ballots were counted in the original canvass but were invalidated and not counted by the recount commission because of the omission of the initials of one of the

clerks. They were, however, found to be valid and were counted by the trial judge of the Randolph Circuit Court. It was the position of the trial court that the legislative enactments authorizing the EVS system of voting vitiated the need for the initials of the poll clerks on each ballot.

It has long been a mandatory requirement under the general election laws of Indiana that the initials of both precinct polling clerks must appear upon the ballot cast by the voter. The law provided that if the initials of the clerks were not present on any ballot, that ballot was invalid and the vote was not to be counted. When this procedure was established, voting was done by paper ballot.

Ind.Code § 3-1-23-12 (Burns 1971) provided as follows:

"At the opening of the polls, after the organization of and in the presence of the election board, the inspector shall open the packages of ballots in such a manner as to preserve the seals intact. He shall then deliver to the clerk of the opposite political party from his own, twenty-five (25) each of the state and local ballots, and to the other clerk a blue pencil for marking the ballots. The clerks shall at once proceed to write their initials in ink on the lower left-hand corner of the back of each of said ballots in their ordinary handwriting, and without any distinguishing mark of any kind. As such successive elector calls for a ballot, the clerks shall deliver to him the first signed of the twenty-five (25) ballots of each kind; and the inspector shall immediately deliver to the clerks another ballot of each kind, which the clerks shall at once countersign as before, and add to the ballots already countersigned so that it shall be delivered for voting after all those theretofore countersigned."

Ind.Code § 3-1-23-21 (Burns 1971) provided as follows:

"[T]he clerk holding the ballots shall deliver to the voter one (1) of each of the ballots which he shall be entitled to vote at said election and the other clerk shall thereupon deliver to him a blue pen-

cil.... Before leaving the booth or compartment, the voter *shall fold his ballot* separately so that no part of the face thereof shall be exposed, and *so that the initials of the clerk shall be exposed*, and on leaving the booth or compartment, shall return the pencil to the clerk and deliver the ballots to the inspector, or to the judge ... who shall forthwith, in the presence of the voter and of the election board, deposit the same in the respective ballot boxes, .... If a voter shall *offer to vote a ballot so folded as not to disclose the initials of the clerks* and also not disclose the face of the ballot, *the election board shall direct him to return to the booth and fold his ballot properly.*" (emphasis added)

Ind.Code § 3–1–32–26 (Burns Supp. 1980) makes it a class A misdemeanor for an election official to knowingly deposit a ballot not containing the initials of the clerks into the ballot box. Ind.Code § 3–1–25–1 (Burns 1971) on the subject of canvassing paper ballots after the polls have closed, provided:

"The precinct election boards except as otherwise herein provided shall, in canvassing the votes, begin first with the state ballots and complete them before proceeding with the local ballots, by laying each ballot upon the table in the order in which it is taken from the ballot box; and the inspector and the judge of election differing in politics from the inspector shall view the ballots as the names of the persons voted for are read therefrom. And in the canvass of the votes any member of the election board may protest as to the counting of any ballot, or any part thereof, and any ballot which is not indorsed with the initials of the clerks, as provided for in this act, and any ballot which shall bear any distinguishing mark or mutilation shall be void, and shall not be counted...."

These statutory provisions have, in substance, been a part of the paper ballot system since its enactment in 1880. The provisions of these sections have been construed by this Court to be mandatory, requiring any ballot not containing the signatures of both poll clerks to be determined to be void and not counted. *Parvin v. Wimberg,* (1891) 130 Ind. 561, 30 N.E. 790; *Blue v. Allee,* (1916) 184 Ind. 302, 111 N.E. 185; *Werber v. Hughes,* (1925) 196 Ind. 542, 148 N.E. 149; *Conley v. Hile,* (1935) 207 Ind. 488, 193 N.E. 95. In *Parvin v. Wimberg,* 130 Ind. at 571, 30 N.E. 790 we stated:

"The immediate purpose of the provisions of § 34 is to prevent the counting of fraudulent votes by requiring the poll clerks to endorse their initials upon the official ballots, to the end that they be identified when taken from the ballot box .... Of course so much of the statute as requires the ballots to be endorsed with the initials of the poll clerks is mandatory, ...."

There are, of course, two points at which the officials are to be alerted to a determination that only valid and proper ballots are being voted. The first is in the polling place at the time of voting. These statutes provide for a method to be employed so that the officials at the precinct can determine that only the official ballots are being voted and placed in the ballot box. The integrity of the ballot is then determined at each stage until the ballot reaches the ballot box. Under this system the initials were placed on the ballot by the poll clerks as they handed it to the voter. The voter was instructed to ascertain that the initials of the poll clerks did appear on his ballot, and he was further instructed to fold the ballot so that the face of it containing his votes was folded in and the corner on which the clerks' initials appeared was exposed. He was then to take the ballot to the inspector with the initials exposed and present it to him. The inspector was then to determine that the initials were on the ballot before placing it in the ballot box. If a ballot was presented to the inspector without the initials showing, he instructed the voter to return to the booth and fold the ballot so that the initials would be exposed. If the ballot had no initials on it, then the inspector would not permit that ballot to be placed in the box, and the determination could be made at that point whether a

mistake had been made or if an attempt was being made to deposit a fraudulent ballot. The next check point was during the counting of the ballots after they were removed from the ballot box. Since the paper ballots were counted by the polling officials at the polls, one of the duties of those counting at the precinct, was to determine that the initials of both poll clerks appeared on each ballot. If a ballot was found to come from the ballot box and did not contain both sets of initials, it was to be voided and was not to be counted by the poll officials.

The enabling statutes authorizing the EVS system provide in § 3–2–4–3(c) (Burns 1971):

"The provisions of this Act (§ 3–2–4–1— 3–2–4–10) shall be controlling with respect to elections where electronic voting systems are used, and shall be liberally construed so as to carry out the purpose of this act. Any provisions of law relating to the conduct of elections which conflict with this act shall not apply to the conduct of elections with an approved electronic system . . . ."

The question here then is: Does the settled election law of Indiana conflict with the provisions of the EVS Act? If requiring the initials of the polling clerks on the ballots creates a conflict with the EVS system of voting, then the EVS statutes would govern and the placing of the clerks' initials on the ballots would not be required. Conversely, of course, if there is no conflict, then the general prevailing provisions of the election law would be applied and those EVS ballots not containing initials of the poll clerks would be void.

There were some changes in the system of voting under the EVS system. It is apparent that this was necessary because of the nature of the equipment used to record and count the votes electronically. The pertinent sections of the EVS Act applicable to our consideration here are as follows. Ind.Code § 3–2–4–4(d) (Burns 1971) provides:

"A sufficient number of ballots or ballot cards of the size, design and stock suit-able for processing by automatic data processing machines shall be provided for each precinct where an electronic system is used. Each ballot card shall have two (2) attached perforated stubs on which is printed the same serial number. The top stub shall be bound or stapled in the package of ballot cards which is retained by the election officers in charge. The name of the governmental unit holding the election, the designation and date of the election, instructions to voters, and in primary elections the name of the political party shall be printed on the second stub, which shall be removed by the election officer in charge before the voted ballot card is deposited in the ballot box. The precinct number or designation shall be printed on the ballot card."

Ind.Code § 3–2–4–4(e) provides:

The county election board shall cause the marking devices to be put in order, set, adjusted and made ready for voting when delivered to the election precincts. Before the opening of the polls the precinct election officials shall compare the ballots used in the marking device with the sample ballots furnished, and see that the names, numbers and letters thereon agree and shall certify thereto on forms provided for this purpose. The certification shall be filed with the election returns. In addition to the instructions printed on the ballot or ballot labels, instructions to voters shall be posted in each voting booth or placed on the marking device. Each voter shall be instructed how to operate the voting device before he enters the voting booth. When a voter is handed a ballot or ballot card he shall be instructed to use only the marking device provided for punching or slotting the cards and that he is not to mark his ballot or ballot card in any other way, except for write-ins. He shall also be instructed to place his ballots in an envelope or other container after he has voted, or to fold his ballot card or cards in such manner, so that no card upon which a choice is indicated is exposed. If he needs additional instruction after entering the voting booth, an election officer may if nec-

essary enter the booth and give him such additional instructions. Where ballot cards are used, after the voter has marked his ballot card, he shall place it inside the envelope provided for this purpose and return it to the judge, who shall remove the stub and deposit the envelope with the ballot card inside the ballot box. No ballot card from which the stub has been detached shall be accepted by the judge in charge of the ballot box, but it shall be marked "SPOILED" and placed with the spoiled ballots."

Ind.Code § 3–2–4–5 (Burns 1971) gives the procedure to be followed after closing the polls in an EVS election as follows:

"(a) In precincts where an electronic voting system is used, as soon as the polls are closed, the inspectors shall secure the marking devices against further voting. They shall thereafter open the ballot box and count the number of ballots or envelopes containing ballots that have been cast to determine that the number of ballots does not exceed the number of voters shown on the poll or registry lists. If there is an excess, this fact shall be reported in writing to the appropriate election officer in charge with the reasons therefor if known. The total number of voters shall be entered on the tally sheets."

"(b) The inspector shall place all ballots that have been cast in the container provided for the purpose, which shall be sealed and delivered forthwith by the inspector and a judge of the opposite political faith to the counting location or other designated place, together with the unused, void and defective ballots and returns."

The method used for voting in the EVS system used a ballot card with two attached perforated stubs, each bearing the same serial number. The top stub was bound or stapled in the package of ballot cards which was to be retained by election officials. As voters presented themselves to the poll clerks, the clerks removed from such packs the computer ballot card and the wide stub attached to the ballot card, by tearing at the perforation line between the narrow stub and the wide stub. The narrow stub is about one inch wide and is bound and stapled and bears a serial number. When it is viewed vertically, it is the top stub. The ballot cards were placed in grey envelopes at the time they were handed to the voters by the clerks. These envelopes are just large enough to cover the computer ballot cards. The wide stub which remains attached to the ballot card remains fully exposed with the serial number on the stub visible. According to Ind.Code § 3–2–4–4(d) (Burns 1971) this second stub is also used to show the name of the governmental unit holding the election and the designation and date of the election. The voter is instructed to take the envelope and ballot into the voting booth. Voting is done by pushing the card into a slot provided for it and using a stylus to punch out numbered slots which identify the office or officer one wishes to vote for. The result of this is to leave a square hole in the card which will be read by the computerized counting equipment which registers the vote for that candidate. The voter is then to place his ballot in the envelope provided to him, which is designed to fold so that it completely covers the card and makes it impossible for anyone to visually determine how he voted. The second stub is fully exposed however. The voter then presents his ballot, in the envelope, to the judge, who removes the serial numbered stub, gives the stub to the voter, and deposits the ballot in the ballot box. If the second stub is missing from the ballot when presented to the judge, it is the duty of the judge to refuse to place that ballot in the ballot box.

It is apparent that the legislature has provided for a system in this new method of voting to trace a ballot within the polling place and into the ballot box which can be monitored by the officials there to determine that only proper and official ballots are being voted. Because of the nature of the automatic data processing machines used in this method, the card cannot be folded or bent in any manner. The secrecy envelope is provided so that the secrecy of the selections of the voter can be main-

tained. The duplicate serial numbered stubs provide the means for the judge at the end of the line at the ballot box to determine that only valid and official ballots are being delivered to him for placement in the ballot box, as compared to the paper initialed ballots that were previously used for that purpose. The judge can check with the polling clerks at any point to determine that a ballot presented to him bearing a serial number was, in fact, issued by the polling clerks. At the same time, retention of the first, or top stub, gives a count to the polling officials as to the number of ballots given to voters which can be checked against the number of ballots in the ballot box when the polls have closed to give further assurance that only valid ballots have been voted and placed in the ballot box. The number of ballots in the ballot boxes reconciled with the number of ballots handed out by the polling clerks in the precincts in Randolph County in this election and there is no claim or inference that any fraud was committed.

The question remains as to whether or not the legislature intended, under the EVS system to remove the check on the validity of ballots after they are removed from the ballot box and counted. It is appellee Gettinger's contention that the legislature intended that the initialling of the ballots by the poll clerks was to be dispensed with. He points out that the voter was not instructed to check for polling clerks' initials so that the voter himself could determine that he had a proper ballot. He also points out that it was impossible for the judge to check the ballot and determine that poll clerks' initials were placed thereon without violating the secrecy of the ballot by opening the envelope. He further points out that the precinct boards were not required to check the ballots for initials of polling clerks and void them at the time of counting the ballots after the polls were closed. The only requirement of the precinct officials was to examine the ballots to determine whether or not they were bent or torn so that the data processing machine would not accommodate them. In addition, he argues that even though Ind.Code § 3–2–

4–1 (Burns 1971) grants the State Election Board rule-making authority respecting the use of EVS voting, no rules or regulations have been promulgated by the State Election Board requiring poll clerks' initials upon electronic voting cards. The Randolph County Election Board received no instructions or directives from the State Election Board mandating that poll clerks' initials were to be placed upon voting cards.

Appellant Wright claims that if the legislature had intended to dispense with the initialing of ballots by the poll clerks it could have and would have provided so in enabling statutes. Neither the fact that the county election board felt compelled to require poll clerks' initials, nor the directions of the State Election Board that omitted such directions is determinative as to the intent of the legislature. Ind.Code § 3–2–4–3(c) (Burns 1971) expressly provides that the general provisions of the Act relative to the conduct of elections shall be controlling and that any provisions of law which conflict with this act shall not apply. However; it is equally clear that all other provisions of law relating to the conduct of elections, which do not conflict, must apply.

■ When two statutes or two sets of statutes are apparently inconsistent in some respects, and yet can be rationalized to give effect to both, then it is our duty to do so. It is only when there is irreconcilable conflict that we can interpret the legislative intent to be that one statute gives way to the other. *Mims v. Commercial Credit Corp.*, (1974) 261 Ind. 591, 307 N.E.2d 867; *Medias, et al., v. City of Indianapolis*, (1939) 216 Ind. 155, 23 N.E.2d 590.

■ We are again reminded of our holdings in *Parvin v. Wimberg, supra*, 130 Ind. at 571, 30 N.E. 790, where it was determined that the purpose of requiring initials was "to prevent the counting of fraudulent votes by requiring the poll clerks to endorse their initials upon the official ballots, to the end that they be identified when taken from the ballot box." We are aware too, of the well settled and sound law recognized and expressed in *Brown v.*

*Grzeskowiak,* (1951) 230 Ind. 110 at 131, 101 N.E.2d 639 at 648, *quoting McArtor v. State, ex rel. Lewis,* (1925) 196 Ind. 460, 148 N.E. 477 as follows:

> "The right of the voter is paramount and the neglect of the election officers or even their fraud should not be allowed to deprive the voter of his important right and duty as a citizen to cast his vote and have it counted as cast. Any other rule would, to a dangerous extent, leave the results of an election in the hands of election officers, when the intention of the statute is to promote the exercise of free government by all of the lawful voters of the county, and not to leave it in the hands of the officers selected under the law to serve them."

Our election laws and systems of collecting and counting votes are designed to protect the voter as expressed above. Equal to that responsibility, however, is a responsibility to provide that the will of the electorate is determined and followed so that the franchise of all voters is protected by a system that insures, as much as possible, a lack of fraud and chicanery. Again, we point out that there is no inference of such fraud or chicanery here. However, we must interpret the law to make every effort to prevent the expression of the will of the electorate from being taken from them by fraudulent means. In order to keep the integrity of the system it may happen that some individual voters will be disfranchised through no fault of their own, and in situations where they have made an honest effort to vote for the offices of their choice.

■ In the election under consideration here, it is true that no voters in Randolph County were instructed that they should determine that the ballot they were using had clerks' initials on it. It is also true that the judge placing the ballot in the ballot box could not determine whether there were clerks' initials on the ballot without opening the envelope, which he was not to do. The polling clerks were not instructed to examine the ballots after removing them from the ballot box to determine whether or not they had been initialed. Neither were they to count the ballots or to examine them in any way except to determine that they were not mutilated so that they would be accommodated by the counting equipment. The serially numbered duplicate stubs did provide for a system that enabled those at the polls to check a ballot as it went from one station to the other and into the ballot box. They could determine from the stubs that only proper ballots were being used up to that point. However, the fact remains that when the two stubs had been removed and the ballot card had been placed in the ballot box, there was no way to determine that only proper ballots, passed out by the polling officials at the polls during the election, and no others were in the ballot box, unless the ballots were initialed. The EVS act did not provide otherwise for a method of determining, at this stage, that only those ballots in the ballot box which were being counted were proper ballots. The system of using clerks' initials can, however, provide the knowledge that only initialed official ballots are counted. There is no other way to distinguish an official ballot from a fraudulent one at this point. It is reasonable to assume that the legislature intended to retain the provision of initialling by the polling clerks for this purpose. If this results in an imperfect system which creates some conflict, then it is the responsibility of the legislature to correct those imperfections and not ours. We can see no conflict so irreconcilable that we must set aside one provision of the law for the other. The fact that the judge at the ballot box cannot look at the ballot to determine if it is initialed, and may be subject to a class A misdemeanor charge if it is not, could create some problems. However, that question is not before us, since no one here stands charged in that manner.

We accordingly find the trial judge erred in permitting the counting of these sixty-six ballots and find the recount commission properly voided them. Two of these sixty-six cards did not affect this election. Forty-six of these votes were counted in favor of Gettinger and eighteen were counted in

favor of Wright. Their totals will accordingly be reduced in those amounts.

## II.

■ There is a special provision in the EVS law regarding the handling of a valid card that has become bent or torn to such an extent that it will not be accommodated by the tabulating equipment. The section of the EVS Act covering this situation is Ind.Code 3–2–4–5(c) (Burns 1971) as follows:

"Notwithstanding the provisions of Acts 1945, Chapter 208, Section 289, all proceedings at the counting location shall be under the direction of the appropriate local government election officials, under the observation of at least two (2) election judges or other appropriate election officials who shall not be of the same political party and shall be open to the public, but no persons except those employed and authorized for the purpose shall touch any ballot, ballot container or return. Each container of ballot cards shall be opened and its contents removed. The cards shall be checked to ascertain if the cards are properly grouped and shall be arranged so that all similar cards from the precinct are together. *If any ballot is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, the officer in charge shall cause it to be prepared for processing so as to record accurately the intention of the voter insofar as it can be ascertained, and, if necessary, a true duplicate copy shall be made of the damaged ballot in the presence of witnesses and substituted for the damaged ballot. Likewise, a duplicate ballot shall be made of a defective ballot which shall not include the invalid votes. All duplicate ballots shall be clearly labeled "duplicate," shall bear a serial number which shall be recorded on the damaged or defective ballot and shall be counted in lieu of the damaged or defective ballot. If for any reason it becomes impracticable to count all or a part of the ballots or ballot cards with tabulating equipment, the board of elections may direct that they be counted manually, following as far as practicable the provisions governing the counting of paper ballots.* (emphasis added)

There were apparently over one hundred ballot cards processed in this manner but only twenty-one of them have been questioned in this appeal. At the counting point in Randolph County during the processing of returns a team of six, consisting of three Republicans and three Democrats, were present. One Republican and one Democrat made a re-make team. The category with which we are concerned here involved twenty-eight ballot cards. One of them was an original for which no duplicate appeared, but which was disregarded as it had no effect on the election in contest. There was also a card which was re-made with no matching duplicate; and a duplicate for which no original was found. Of the twenty-seven under consideration, six fell into another category which is not presented to us here. This left a balance of twenty-one ballot cards which were not counted by the re-count commission, but were counted by the trial judge. It is the position of appellant Wright that these twenty-one ballots should not have been counted since no serial numbers appeared on them as the statute requires, which would make it possible to reconcile each original with its own duplicate, and that many of them did not carry the precinct designation. The recount commission did not count any of these ballots because of the lack of identifiable serial numbers and precinct designations in violation of the above statute. The trial judge counted the twenty-one votes in question by counting the original ballot cards rather than the duplicates. It was his belief that he could determine the intention of the voters on those twenty-one original cards by counting them manually. It is the contention of appellant Wright that since these cards were not handled properly under the mandatory language of the statute, the trial judge improperly counted these twenty-one ballots.

Appellee Gettinger claims that appellant Wright has not properly preserved this issue in that she did not identify which twen-

ty-one ballots she was concerned with sufficiently for this Court to know which cards to review. We recognize the merit of this argument, however, in examining the record it appears that each of the twenty-one cards in question was identified by an exhibit number, which number was placed in the judgment of the trial court and was referred to by both of the parties in their briefs to the extent that the twenty-one in question can be readily identified. Because of the importance of this issue, we will consider the counting of these twenty-one ballots.

We are presented here with an unusual situation in the handling of ballots because of the nature of data processing systems. Since these machines will not accommodate bent, folded or torn cards, provision had to be made for processing those that were otherwise in proper order, but were so torn, bent or damaged that they could not be counted by the tabulating equipment. The legislature provided, therefore, that the officer in charge cause a duplicate to be re-made by punching out a duplicate card in the exact fashion that the original was punched. This duplicate card is then run through the processing equipment. Because of the very sensitive situation that is thereby created in that those counting the ballots are re-doing ballots of voters, the legislature provided for a very strict procedure to be followed by a re-make team, consisting of representatives of both parties, so that the will of the voter could be carried out and fraud prevented. It was therefore provided that when a ballot was re-made it was to be re-made exactly as the original was by punching out the identical spots. Immediately a corresponding serial number was to be placed on both the original and the re-make, plus the precinct from which it was cast, so that it could be thereafter determined which ballot card the re-made card represented. This procedure makes it possible to compare the two to see if the re-make is, in fact, exact. Unfortunately, the team re-making these ballots did not comply with the statute and failed to put on the serial numbers. On some cards, the precinct designations do not appear on either the originals or the re-makes. As noted by the trial judge, there were also in this grouping some ballots that had only an original marked "re-make" with no duplicate appearing, and duplicates that had no original with which to match them. Of the twenty-one originals the trial court counted here, all of them were marked re-made and showed evidence of having been bent, torn or folded. However, since they contained no serial numbers, it is impossible to assign them to any particular duplicate that represented them in the original count other than by guess and supposition. Further, the statute provides that when a duplicate is made of an original, that duplicate ballot shall be counted and not the damaged original. Although the reasoning used by the trial judge in permitting these twenty-one votes to be counted is persuasive, we are, nevertheless, of the opinion that they should not be counted. The trial judge pointed out that where a voter has properly cast his ballot and placed it in the hands of election officials, no voter should be deprived of his vote due to any mistake by election officials. He cites us to our own case of *Werber v. Hughes,* (1925) 196 Ind. 542, 553, 148 N.E. 149, wherein it was stated: "The principle follows that irregularities in elections which have nothing to do with the selection among candidates on the ticket, and the expression of the voter to the election officials of such election as required by law, shall not defeat the voter in such expression, and thereby the will and the majority of the electors. The merit of the case is what is to be most desired, and that is the will of the majority of those who have voted." It has always been of paramount concern when ballots are being considered, that, if the voter has fully complied with all legal requirements and placed the ballot beyond his control and he could not be in any position to protect his vote, his ballot should not be rejected for, in essence, clerical error occurring afterwards. *Lorch v. Lohmeyer,* (1969) 252 Ind. 182, 247 N.E.2d 61; *Boone v. Smith,* (1948) 255 Ind. 617, 77 N.E.2d 357, 359; *Werber v. Hughes,* (1925) 196 Ind. 542, 148 N.E. 149. We still

adhere to this principle and confirm our positions in those cases, however, this principle must give way in a situation such as this. Counting the ballots here would ignore the clear written law on the subject, and create a situation that would authorize procedures that would frustrate the proper handling of ballots and even create methods for fraudulent mischief in the counting of the votes. We state this while again noting that there is not even an inference that there was any fraud or mischief in this case.

Since the ballots we consider here were in such a state that they had lost their true identity, the recount commission properly rejected them and the trial judge was in error in permitting them to be counted. The result of this finding is to reduce appellant Wright's count by nine votes and that of appellee Gettinger by twelve.

### III.

■ The ballot card under consideration in this issue was one identified at trial as Contester's Exhibit No. 41-Wayne H and was a card on which the voter apparently attempted to vote a straight Republican ticket but had not sufficiently punched the card. The trial court held this ballot invalid in that the black dot located above the number selected was not firmly punched out as the instructions required the voter to do. Neither the recount commission nor the trial court counted this card. Appellee points out that the card does not even show a punch mark or indentation. It is described by appellee as "if anything the number four slot may appear to be slightly irregular in shape." The recount commission and the trial court were justified in rejecting this card. Since this ballot was not counted the vote count for neither of these parties is affected.

### IV.

■ The ballot cards under consideration in this category concern situations where the voter has over-voted for straight parties and then punched for either Wright or Gettinger on the individual voting spaces. In other words, the voter punched a straight

party ticket for two, three, or even four, different parties and then attempted to vote individually on the Clerk's office. It is clear the EVS Act in Ind.Code § 3–2–4–4(c) (Burns 1971) provides that: "In partisan elections the ballot labels shall include a voting square or position whereby the voter may, by one (1) mark or punch record a straight party vote for all of the candidates of one (1) party except as to offices for which he has voted individually for the candidates of his choice." Ind.Code § 3–2–4–4(e) (Burns 1971) further provides that the voter shall be instructed how to operate the voting device. The evidence was that the voters were instructed here and that the act of voting more than one straight party ticket plus additional individual candidates was a violation of those instructions as well as a violation of the statutes involved.

Some examples that illustrate the voting done on these ballots are represented by Exhibit No. 5–WR–2–S, in which the voter punched for the Republican ticket, the American Party ticket, and the Socialist Workers Party ticket; Exhibit 12–W–2A showed the voter punched for the Republican ticket, the American Party ticket, the Libertarian ticket, and the Communist Party ticket; Exhibit 56–J–K shows a vote for the Democratic Party ticket and the American Party ticket. Appellant claims that in some of these ballots it is apparent that the voter showed that even though he punched all of the straight party tickets, he individually punched a selection of either Wright or Gettinger for Clerk and that therefore the intention of the voter should be honored and that those votes should be counted. In considering a similar situation, in *Sims v. George*, (1968) 250 Ind. 595, 236 N.E.2d 820, at 824, this Court held: "This statute seems to us to be clear authority that any departure from the simple and direct statement of the statute constitutes a violation thereof, since the directions are explicit as to how to vote a straight party ticket or for individual candidates." In *Sims, supra*, the ballot was found to be invalid. The EVS law provides a specific procedure for voting one straight party and then cross-over vot-

ing for individual candidates from another party. The counting machines used will then cancel the vote in that office from the straight party vote. This is provided for in the equipment used to cast ballots and count them and is consistent with the EVS law. The act of voting more than one straight party ticket or of voting more than one straight party ticket and then voting for individual candidates also, goes beyond the provisions of the electronic voting system and against the instructions given to the voters at the poll. The trial court correctly did not count such votes. Since these votes were not counted by the trial court, our judgment on this group of cards does not change the tally of either of these parties.

## V.

■ The ballot cards under consideration in this category involve situations where the voter voted a straight party ticket and then crossed over to vote for individual candidates for the opposite party. It is appellant's contention that the act of crossing over and voting for individual candidates invalidated that ballot card and therefore these ballots should not be counted. The trial court found that the EVS Act provides for cross-over voting in this manner and counted the votes in which this had been done. As we indicated above, Ind. Code § 3–2–4–4(c) (Burns 1971) does authorize cross-over voting where a voter votes for one straight party ticket and then crosses over to vote for individual candidates of the opposite party. Although this type of voting was not authorized previously where paper ballots were used, provision has been made for voting in this manner in both machine voting equipment and EVS equipment. Since the EVS Act provides that these statutes shall control the method of voting over the previous general voting laws where there is a conflict, then there is no reason not to permit the counting of these votes. Voting machines were set up so that a voter could pull a straight party lever and then, by manipulating the tabs for individual candidates, could cancel the vote for one of the candidates in the

straight party vote and replace it with the candidate from the opposite party. Data processing equipment can also accommodate such procedure so that when a voter punches a straight party ticket and then punches a vote for an individual in a given office in the opposite party, the machine will not record the vote in that office on the straight party vote, but will record the vote given to the individual member of the opposite party. Voters were instructed in this election in Randolph County on how to follow this procedure. The trial court properly counted these ballots. Our finding here does not change the tally of either of the parties.

## VI.

The category under this issue involves ballots containing distinguishing marks and hanging chads.

■ A distinguishing mark is a mark or indication on the face of a ballot that appears to have been placed there by the voter in order to identify that ballot as the one cast by that particular voter. Since the institution of our voting laws, the distinguishing mark on the face of a ballot has rendered that ballot void. This has been found to be a mandatory provision of our law since *Bechtel v. Albin*, (1892) 134 Ind. 193, 33 N.E. 967, designated it so. This rule still appears in our law in Ind.Code § 3–1–25–1 (Burns 1971). It was the trial court's opinion here, that since the ballots are no longer counted manually at the precinct level, but are counted mechanically by the data processing equipment, the EVS Act intended to change the law that voided ballots having apparent distinguishing marks. We disagree with the trial court in this regard. There is no expression by the legislature in the EVS Act of an intent to change the law with regard to distinguishing marks. The trial court further found here, however, that the marks appearing on the face of four ballots under consideration were not distinguishing marks under our general election laws and did not invalidate these four ballots. There were some marks

that were obviously put on the ballots by the polling clerks and there was a red stain on one that was very faint and could have been placed there at any point, even at the time the original card was printed. There was no evidence whatsoever presented by appellant Wright that tended to show in any way that any of these markings could be considered to be distinguishing marks. The trial judge decided that they were not, and we see no reason to question his judgment in this regard.

■ The two remaining ballots in this category contained "hanging chads" which indicated that ballots had been punched but that the punched section, or parts of it, were hanging partially attached to the card and underneath the card. The trial judge found that since they did show that the square was punched out of the card, and the intention of the voter could clearly be discerned, it was proper to count these two votes. We see no reason to disturb the judgment of the trial judge in this regard. This is not a situation such as the one in Issue III above, where the ballot card did not show a punch mark or indentation. There was no evidence presented by appellant Wright that would guide the trial court in determining whether or not these two votes had actually been recorded by the data processing equipment. Without sufficient evidence being presented to the court to determine whether or not the data processing equipment even recorded these votes, the trial judge was justified in overruling the appellant in striking these two ballots. Our finding here does not change the tally of either of the parties.

Under our findings in Issue I, the total for Gettinger is to be reduced by forty-six (46) and the total for Wright is to be reduced by eighteen (18). Under Issue II, Gettinger's total is to be reduced by twelve (12) and Wright's by nine (9). Findings under Issues III, IV, V, and VI did not affect the vote count. Therefore, the result is a reduction in total for Gettinger of fifty-eight (58) and for Wright of twenty-seven (27) from the vote count determined by the trial court. This leaves a total vote

for Gettinger of Five Thousand Nine Hundred forty-five (5,945) and a total for Wright of Six Thousand sixty-four (6,064).

We remand this case to the trial court with instructions to enter judgment in accordance with this opinion.

GIVAN, C. J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.