George SCHOFFSTALL, Appellant,

v.

Frank P. KAPERAK, Appellee.

No. 1283S430.

Supreme Court of Indiana.

Jan. 4, 1984.

Gerald H. McGlone, Terre Haute, for appellant.

William C. McClain, Terre Haute, for appellee.

PIVARNIK, Justice.

This is an appeal from a judgment of the Vigo Superior Court in an election contest held in Vigo County. The controversy arises out of the Democratic Primary Election on May 4, 1982, in Vigo County, for the office of County Commissioner, District I. This action was brought by the appellant, George Schoffstall, as contestor against Frank P. Kaperak and Donald R. Cottrell for a recount of votes and contest of election. Mr. Cottrell has declined to take part in the case; thus, the issues to be resolved are between Schoffstall and Kaperak. The cause was originally filed in the Court of Appeals under No. 4–1282 A 375, but was transferred to this Court pursuant to Ind.R.App.P. 4(A)(10) as a result of the appellant's Verified Petition and the granting thereof on December 6, 1983. It is docketed in this Court under No. 1283 S 430.

Vigo County uses the electronic voting system (EVS), under which system the voter casts his vote by punching a ballot card with a stylus. These cards are then counted by a computer at a central location. Following the official counting of votes, the Vigo County Election Board announced that Kaperak was the winner over Schoffstall by 131 votes. Schoffstall filed a petition for a recount of the votes and for contest of election, alleging fraud, malconduct and irregularity in the voting and counting. The recount commission conducted a manual recount of 61 of the 109 precincts and concluded that Kaperak was the winner over Schoffstall by 47 votes. The election contest was tried to the court. The trial involved allegations of pre-punched ballots, influence of absentee voters by absentee voting board deputies, failure to seal absentee ballots in envelopes, absentee ballots being voted and somehow not being counted, more absentee votes counted than the number of applications for such ballots, manipulation of confined absentee voters at the county home, ballots counted without having been initialed by the poll clerks, transfer cases left unsealed, ballots counted without a precinct designation on them, clerk's initials printed instead of handwritten, and combinations of the above. The trial court ruled that Kaperak was the winner over Schoffstall by 22 votes.

Six issues are presented for our review in this appeal, as follows:

1. whether fraud, malconduct, or irregularity occurred in Precinct 5–A so as to justify rejection, as untrustworthy, of part or all of the ballots counted for that precinct;

2. whether fraud, misconduct, or irregularity occurred in the absentee voting so as to justify rejection, as untrustworthy, of part or all of the absentee ballots counted in various precincts;

3. whether absentee voted-in-person ballots cast in the clerk's office and initialed by clerks in the courthouse, but not initialed by the precinct poll clerks on elec-

tion day, should have been counted or rejected;

4. whether the ballots contained in a transfer case should be counted where that transfer case was unsealed from the time it left the precinct until it was delivered at the courthouse;

5. whether ballots not containing a precinct designation should be counted; and,

6. whether ballots bearing printed clerk's initials, instead of handwritten initials, should be counted.

Rather lengthy facts are set out by the parties to show the number of problems that arose in the county commissioner's race at this election. Although there is some conflict between the parties in conclusions to be drawn from these facts, it is apparent that there are at least strong inferences that there were irregularities in certain areas that amounted to fraud and malconduct. One of the areas of concern was precinct 5–A. Greg and Ginger McCoy voted Democrat in precinct 5–A. A poll worker, Debbie Kirk, asked them to go on back to the voting machines and told them that she had already inserted the ballots into the machines. Greg McCoy pulled his card out to look at it before voting and found that it had been pre-punched in every line. He brought this to the attention of Debbie Kirk, who told another clerk that there were two mutilated ballots and she needed new ones. Greg, wondering why she needed two new ballots, went over to the voting booth where his wife Ginger was voting and had her pull her card out of the machine. Ginger had not yet voted but her card had also been pre-punched. Kirk took the two pre-punched cards and gave the McCoys two new cards which they then placed in the machines and voted. Mr. McCoy happened to be a city detective and he gave a statement under oath about the incident to the Vigo County Election Board.

Margaret Beecher also voted in the primary in precinct 5–A. She said one of the poll workers took her to the voting booth to show her how to vote, even though she did not ask for help, and attempted to insert her ballot in the voting machine. Mrs. Beecher stopped the woman from doing this, saying she was able to do it for herself. Mrs. Beecher inserted the card and voted. She did not look at her ballot to see whether or not it had been pre-punched. Nina Isham had an experience similar to that of Mrs. Beecher.

The report of the recount commissioners showed that out of the 61 precincts counted, there were 65 double punched ballots. 24 of these double-punched ballots (37%) occurred in precinct 5–A. It was further stipulated by the parties that of the 24 double-punched ballots in precinct 5–A, 17 were double-punched for Kaperak and Schoffstall and 7 were double-punched for Kaperak and Cottrell. There were no double-punched ballots for Schoffstall and Cottrell. These double-punched ballots could be significant if the ballots were pre-punched for a particular candidate. If a ballot was pre-punched for Kaperak and the voter voted for Kaperak then of course that would be a good vote as the stylus would go through the same pre-punched hole. If a voter chose not to vote at all in the commissioner's race, Kaperak would still get a vote because it had been pre-punched for him. If, however, a person voted for Schoffstall, there would be a double-punched ballot and the machine would not count it. In its investigation, the Election Board noted an abnormal amount of double-punching in precinct 5–A and made the following findings:

"... [T]here is grave suspicion that a number of voting irregularities occurred in precinct 5–A on Primary Election Day, which it is the desire and intent of the Vigo County Election Board to avoid in future elections. Even though the Vigo County Election Board has not been able to prove that these irregularities were the result of the action of any one or more individuals on the 5–A Precinct Election Board, we strongly feel that in the interests of honest and fair elections and in the interests of the Vigo County electorate, we will recommend to the chairmen of both political parties that members of the Precinct 5–A Election

Board not be nominated to serve in future elections."

Ruel F. Burns, Clerk of the Vigo Circuit Court, referred to the pre-punching in precinct 5–A as "an abnormal amount," strongly suggesting pre-punching of ballots in that precinct. Mr. Burns testified that the reason the Election Board recommended removal of all 5–A precinct workers from the election process was: "If one of these people had been involved in trying to swing an election by pre-punching ballots, they had to have some collusion, so we felt it was worthwhile to make sure that those four or five people weren't allowed to work at an Election Board again." The Election Board's investigation showed no mechanical failure to explain the high number of double-punched ballots in precinct 5–A. Contestor George Schoffstall testified that the inspector in precinct 5–A, Debbie Kirk, was definitely against him in the primary election and that she and her boss, the city clerk, had told him that.

A number of problems also arose in regard to absentee voter ballots. There are three kinds of absentee ballots: 1. Confined; 2. Mail-in; and, 3. voted-in-person in the courthouse. All were voted before the election day and then held in the clerk's office to be taken to the precincts on election day where they were placed in the ballot boxes with the regular ballots. The recount commission could identify the confined and mail-in absentees from the voted-in-person absentees. Several witnesses testified that they voted confined absentee ballots in precinct 7–F. They said they were not allowed to vote by themselves but the deputies who brought the ballots to them stayed in the room and watched them vote. The ballot was then taken by the deputy without first inserting it in the cover. Loretta Hamilton testified that she voted a confined absentee ballot in precinct 7–F and voted for George Schoffstall. The deputies stayed in the kitchen and watched her vote even though she asked them to leave. After the voting Hamilton said they did not put the ballot in an envelope and seal it but were looking at the ballot as they walked out. When the votes were counted, Schoffstall did not receive any confined absentee votes in precinct 7–F.

Reverend Morris Blade and his wife voted confined absentee ballots in precinct 7–F and they were told by the deputies not to vote for Schoffstall, but were persuaded to vote for Kaperak. The Blades were told: "He's been in office long enough and we don't think he should hold it any longer." Mr. and Mrs. Charles Garvin voted in precinct 7–C by confined absentee ballot. The Democrat deputy who brought the ballot to them was Debbie Kirk. She put both ballots in the machine and voted it herself. She did not let the Garvins vote their own ballots. She also did not put the ballots in the envelopes and seal them but told them she would do it later. Garvin complained to the Democratic precinct committeewoman about the way the absentee voting was handled and she had them come down on election day and vote directly. Apparently the absentee ballots they previously voted were not voided as there were no voided Democrat absentee ballots in precinct 7–C.

There was also testimony that Margaret Koile, Administrator of the County Home, had cards, with the last names of certain candidates on them, given to the people at the Home as they voted their absentee ballots. The certificate of the recount commission showed that there were 46 absentee Democrat votes cast in precinct 6–E, the County Home. 45 of them were for Kaperak and one of them was for Schoffstall. These were later rejected because the ballots did not have the clerk's initials on them. There were other incidents of irregularity that will be mentioned later in this opinion as the issues arise.

## I & II

■ Issues I and II will be combined here because of their similar disposition. Appellant Schoffstall contends that because of the apparent fraud, malconduct and irregularity occurring in precinct 5–A, all of the ballots in that precinct should be rejected. He makes a similar contention with regard to all of the absentee ballots

that were cast in the election for county commissioner. As we have already indicated, there were a number of irregularities in both areas of this election. There were other details of irregularity that we do not find necessary to set out in this opinion. Much of the evidence concerning the irregularities was in conflict. We do not feel that the allegations of improper voting procedure justify the rejection of all ballots in precinct 5–A or in the case of the absentee ballots. This would be a gross overkill that would disfranchise many voters that honestly voted their choices in the election and in which there is no evidence of irregularity. The trial court came to this same conclusion and refused to strike all of the ballots cast in precinct 5–A and all of the absentee ballots.

We do note that the trial court made two adjustments in the votes that appear to be improper. Reverend Blade and his wife testified that they were unduly pressured to vote for Kaperak when they wanted to vote for Schoffstall. The court found that that type of influence was improper and he credited Schoffstall with two votes and deducted two from Kaperak. He acted similarly in regard to the contentions of another couple, Mr. and Mrs. McGrew. The McGrews had voted absentee ballots for Schoffstall but in their precinct no absentee ballots appeared for that candidate. The trial court then credited Schoffstall from that precinct and deducted two from Kaperak. Although this adjustment in the votes by the trial court may appear to be justified and fair, there is no legal basis for it. A recount involves the examination of the ballots cast by the voters in an election. The duty of the trial court was to examine these ballots and decide whether they should have been counted or rejected. A general adjustment of the vote tally based on what ballots should or should not have been in the ballot box is not contemplated. We therefore find the trial court improperly credited Schoffstall with four votes and improperly deducted four votes from Kaperak.

III

Schoffstall contends that all of the regular ballots and all three types of absentee ballots, which were not initialed by the precinct poll clerks, should not have been counted. The recount commission, under instructions from the court, did not count any regular ballots or confined or mail-in absentee ballots which were not initialed by the precinct poll clerks. However, the recount commission did count 80 absentee ballots, 52 for Kaperak and 28 for Schoffstall, which were voted in person in the courthouse and initialed by the clerks there, but were not initialed by the precinct poll clerks in the precincts where these absentee ballots were placed in the ballot boxes. The precinct poll workers were instructed that all absentee ballots were to be initialed by the precinct poll clerks before placing them in the ballot boxes.

Schoffstall is correct in his contention that the recount commission improperly counted these ballots. This issue already has been decided by us in *Wright v. Gettinger*, (1981) Ind., 428 N.E.2d 1212. We found there that the poll clerks' initials were important not only to show that only valid ballots go into the ballot box but was also needed so that the valid ballots could be identified when taken from the ballot box. The importance of having the poll clerks' initials on the ballots, insures the integrity of the voting system. Ind.Code §§ 3–2–4–1 through 3–2–4–10 (dealing with the Electronic Voting System) are not in conflict with the early voting statutes and indicate that ballots not initialed by the poll clerks should not be counted. As we stated in *Wright, supra:* "The system of using clerk's initials can, however, provide the knowledge that only initialed official ballots are counted. There is no other way to distinguish an official ballot from a fraudulent one at this point." 428 N.E.2d at 1220. The eighty ballots in this category validated by the recount commission should therefore be rejected. This results in an adjustment of subtracting 52 from Kaperak's total and 28 from Schoffstall's total.

## IV

▮ The transfer case in precinct 1–A was not sealed between the time the election proceedings were concluded in that precinct and the time it was delivered to the courthouse for counting. Schoffstall contends that all of the votes in this precinct should therefore be rejected. Kaperak concedes the transfer case in precinct 1–A was not sealed during its trip from the polling place to the courthouse but claims this was not a sufficient ground for rejecting all of the ballots contained therein. He points to the testimony of Kathleen Stanton, Inspector in precinct 1–A. Stanton testified she packed the transfer case at the precinct and was accompanied by the Republican judge from the time of the packing until turning the transfer case over to an election supervisor at the Vigo County Courthouse. Stanton said she erred by not sealing the case but it was in her custody every minute and she was in the company of the Republican judge every minute until the transfer case was turned over to the supervisor in the courthouse. The applicable statute is Ind.Code § 3–2–4–5(b) which provides: "The inspector shall place all ballots that have been cast in the container provided for the purpose, which shall be sealed and delivered forthwith by the inspector and a judge of the opposite political faith to the counting location or other designated place, together with the unused, void, and defective ballots and returns."

It is obvious that the purpose of this procedure is to again ensure the integrity of the ballots from the time they leave the custody of the precinct board until they arrive at the counting place in the courthouse and are turned over to the proper authorities there. In the meantime the transfer case is in the custody of the inspector from the Democratic party and a judge of the Republican party. The only insurance that no tampering has taken place between these two points is the presence of the seal which is placed on the transfer case at the voting precinct and later broken and opened at the counting place. The recount commission counted 50 ballots cast for Kaperak in this precinct and 38 for Schoffstall. The trial court found that the seal's absence was merely an oversight and did not justify the rejection of all of these ballots. We disagree. Although it is, unfortunately, a drastic measure to reject all 88 ballots from this precinct, it is the only way at this juncture that we can be assured that the law is being complied with and the integrity of the voting process is maintained. There is merit to Schoffstall's claim that in view of an election that has shown much mischief and mishandling of ballots, it is important to apply the law strictly in determining which ballots are to be accepted and which are to be rejected. That is the purpose of the various enactments of the legislature setting out the procedures to e followed by those handling the ballots. This ensures that the will of the voters is being accurately expressed in the ballot tally. This, of necessity, results in the disfranchising of certain voters who cast honest and good ballots in that precinct. There is no evidence or allegation that there was mischief or purposeful fraud in precinct 1 but the statute is clear in its provisions and its purpose is very apparent. We therefore find an adjustment should be made in the tally of the recount commission in this precinct by subtracting 50 votes from Kaperak and 38 votes from Schoffstall.

## V

▮ There were a number of ballots that did not contain a precinct designation on them. Schoffstall contends that the ballots not bearing the precinct designation should be rejected. The recount commission determined that there were 77 Kaperak and 27 Schoffstall ballots not bearing a precinct designation. The recount commission counted these ballots. The trial court also determined that these ballots should not be rejected because of this shortcoming and counted them. The applicable statute, Ind. Code § 3–2–4–4(d), provides as follows: "The precinct number or designation shall be printed on the ballot card." The poll workers were instructed to enter the pre-

cinct designation on the backs of the ballots. They were told to turn the ballot over so that they could not see the manner in which the voter voted and pull the card out far enough from the envelope to enter the precinct number on the back of it. The instructions were: "Using only a Flair pen ... a Republican and Democrat clerk must enter the ward and precinct numbers on the back lower section of the ballot." The law is again very clear and mandatory. So were the instructions given to the poll workers. The purpose of this legislation is also very clear. It provides an additional means of identification and proof of authenticity of the ballots. This requirement is similar to having the initials of the precinct poll clerks placed on the ballots so that one can determine the authenticity of the ballots when they are removed from the ballot box. We therefore find that the recount commission and the trial court erred in failing to reject these ballots. 77 votes are subtracted from Kaperak's total and 27 votes are subtracted from Schoffstall's total.

## VI

■ Finally, there were a sizeable number of ballots bearing printed clerk's initials instead of handwritten initials. Schoffstall contends that ballots bearing initials which are not handwritten as required by the statute should be rejected. Kaperak admits the statute requires initials to be handwritten but relies upon *Brown v. Grzeskowiak,* (1951) 230 Ind. 110, 101 N.E.2d 639, for his contention that this shortcoming does not require that the ballots be rejected. *Brown* concerned a provision in the statute requiring the clerk's seal and signature on absentee ballots. The statute under consideration in *Brown* was § 29–4907 of Burns 1949 Replacement which provided the clerk was to place his signature on the ballot:

"While this court has held that the provision requiring the clerk's seal and signature is mandatory, *Werber v. Hughes* (1925), 196 Ind. 542, 148 N.E. 149, *supra,* and it will be strictly enforced, however, for the purpose of ascertaining whether or not there has been sufficient compliance to accomplish the purpose of the Legislature, such provision will be liberally construed, and a substantial compliance is all that is necessary to legalize and make official absent voters' ballots cast in good faith, in the absence of fraud."

230 Ind. at 130, 101 N.E.2d at 647. The Court then went on to discuss the definition of "signature" and determined that a person's signature may be his initials or even a mark with an "X" if that is what that person uses as his official signature. The Court found that even though a person does not write out his whole name as a signature or even if he does not designate he is the clerk by placing the clerk's seal thereon, there was substantial compliance that made the ballot recognizable as an official ballot. *Id.* at 146, 101 N.E.2d at 654.

The statute facing us today is much more descriptive in its definition of the requirements. Ind.Code § 3–1–23–12 provides: "The clerks shall at once proceed to write their initials in ink on the lower left-hand corner of the back of each of said ballots in their ordinary handwriting and without any distinguishing mark of any kind."

It is apparent the legislature was aware of the differing interpretations put upon general language and attempted to clearly express its intention. If the legislature had thought the form of the initials placed on the ballot was unimportant, it could merely have provided that "The clerks shall place their initials on the ballots" or that "The clerks shall write or print their initials." This the legislature did not do. The legislature provided that the clerks were to write their initials in their ordinary handwriting. It is difficult to conceive how the legislature could have made its intentions more clear. Since the intention of the legislature is clearly ascertainable and is mandatory, we have no choice but to apply it as the law. We therefore find that an adjustment should be made as follows:

Kaperak subtracts 2235 votes, Schoffstall subtracts 1604 votes.

Kaperak raised several issues in a cross appeal. The issues already decided in this opinion concern the same incidents raised in Kaperak's cross appeal and there is no need to address them.

We therefore find the results to be as follows: the tally by the recount commission was Kaperak 7774 and Schoffstall 7727. We found absentee voted-in-person ballots cast in the clerk's office and initialed by clerks in the courthouse but not initialed by the precinct poll clerks on election day were to be rejected, resulting in a deduction of these totals: Kaperak, 52, and Schoffstall, 28. We found ballots contained in a transfer case which had not been sealed while being transported to the courthouse were to be rejected, which resulted in a deduction for Kaperak of 50, and Schoffstall of 38. We found ballots not containing a precinct designation should be rejected, resulting in a deduction for Kaperak of 77, and Schoffstall of 27. Finally, we found that ballots that did not bear handwritten initials of clerks should be rejected, which results in a deduction from Kaperak of 2235, and a deduction from Schoffstall of 1604. This results in a total deduction from Kaperak's score of 2414, leaving him with a final tally of 5,360. It leaves Schoffstall with a total deduction of 1697, leaving his final tally at 6,030.

This cause is now remanded to the trial court with instructions to enter judgment in accordance with this opinion.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.